RALPH W. BALES AND RUTH C. BALES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bales v. Commissioner
Docket Nos. 12479-82, 28639-84, 18832-82, 28657-84, 4499-83, 28681-84, 12274-83, 28787-84, 13174-83, 28938-84, 13800-83, 29108-84, 14178-83, 29111-84, 14956-83, 29404-84, 16414-83, 29464-84, 18099-83, 29594-84, 24307-83, 29681-84, 21409-84, 29701-84, 28638-84, 1970-85.
United States Tax Court
T.C. Memo 1989-568; 1989 Tax Ct. Memo LEXIS 581; 58 T.C.M. (CCH) 431; T.C.M. (RIA) 89568; October 19, 1989. Jim Dismukes,Douglas A. MacDonald,John M. Bekins,Thomas E. Smail, Jr., for the petitioners. Theodore Garelis, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: These consolidated cases were assigned to Special Trial Judge Daniel J. Dinan pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755), and Rules 180, 181, and 183. [2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: These cases were consolidated for trial, briefing, and opinion. The 26 dockets which were tried are test cases for petitioners *586 in similar partnerships. Some of those other petitioners have stipulated to be bound by the opinion in these consolidated cases. Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as set forth in appendix B. The deficiencies in tax result from respondent's disallowance of losses and investment tax credits incurred by petitioners in their investments in cattle breeding partnerships. The issues for decision are: (1) whether the purchase price of the cattle was within a reasonable range of their actual value; (2) whether the benefits and burdens of ownership transferred from seller to buyer; (3) whether petitioners had a profit objective when entering into these transactions; (4) whether the expenses incurred by the partnerships were ordinary and necessary; (5) whether petitioners are entitled to deductions for interest; (6) whether petitioners are entitled to depreciation allowances; (7) whether petitioners are entitled to deduct the management fee; (8) whether petitioners are entitled to investment tax credits; (9) whether petitioners are entitled to capital gains treatment on the disposition of the cattle; and (10) whether petitioners *587 are liable for an increased rate of interest under section 6621(c) for entering into a tax motivated transaction. Some of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated by this reference. At the time the petitions were filed in these cases all petitioners resided in California, except for two petitioners who resided in the following places: Petitioner
Docket No.
Place of Residence
Bales
12479-82 Texas
Pugh
29681-84 Saudi Arabia
FINDINGS OF FACT These cases concern various transactions between petitioners as investors in cattle breeding partnerships and the Hoyt family as promoters and managers of the breeding partnerships. Background
The Hoyt family first became involved in raising cattle in the early 1950s. Walter J. Hoyt, Jr. began by purchasing cattle for his sons who raised and showed them at 4H and FFA events. Soon thereafter Mr. Hoyt decided to get in the actual business of raising cattle. He began without much direction. He bought registered Shorthorns here and there. This approach caused him to accumulate a conglomerate of cattle from other cattlemen's breeding programs. Sometime *588 in the early 1960's, he decided to get serious about developing his own purebred program. He sold off the cattle he had previously purchased and embarked on a plan to raise his own purebred herd. He bought cattle that fit his model. On occasion he purchased entire small herds from other breeders to give some uniformity to his new herd. The cattle Walter J. Hoyt, Jr. purchased in the early 1960's cost him approximately $1,500 a head. The uniform Shorthorns he purchased in the early 1960's became known as the "Hoyt Base Cows." These cows were so named because they formed the genetic base that produced the cows involved in the partnerships and even the cows on the ranch today. The data available on the "Hoyt Base Cows" is less extensive than the data on the cattle raised by the Hoyts because the Hoyts kept better records on the cattle they raised. In order to increase his herd, Walter J. Hoyt, Jr. needed new capital. He raised capital by selling some of his cows to neighbors and friends. After he sold them he would enter into an agreement to manage the cows sold. The management fee would be paid either on a crop share or cash basis. The sale of these cows and the management *589 agreement were all done orally. The persons who purchased these cattle often had the cattle registered in their names. However this caused a problem when trying to sell them because those persons did not have the same name recognition as Walter J. Hoyt, Jr. did. In January 1972, Walter J. Hoyt, Jr. died. His sons took over the cattle operation after his death. Generally speaking Walter J. Hoyt III (hereafter Jay Hoyt) took over the business end of the operation and Richard D. Hoyt (hereafter Ric Hoyt) took over the breeding end of the operation. Their brother Steve Hoyt is also involved; he runs the farming operation. Their sister Jana works in the office. In December 1971, the general partnership of Walter J. Hoyt and sons, which consisted of Walter J. Hoyt, Jr. and his five sons, was converted into a California limited partnership. Walter J. Hoyt, Jr., Jay Hoyt, and Ric Hoyt were general partners. Seth Hoyt, Steven A. Hoyt, Jeffrey K. Hoyt, Bruce C. Smith, Mildred Summers, and Lola Hillman were limited partners. This limited partnership was formed shortly before Walter J. Hoyt, Jr.'s death. However, because of his death the limited partnership was never implemented. Its *590 only asset is a membership in the American Shorthorn Association. The name, Walter J. Hoyt and Sons, which is the name registered with the American Shorthorn Association, is the herd name for the Hoyt cattle operation. Hoyt & Sons is a partnership consisting of Ric Hoyt, his brother Steve, his sister Jana, and his sister-in-law Betty Jean (Jay Hoyt's wife). Hoyt & Sons was the owner of the cattle (the progeny of the Hoyt Base Cows) sold to the partnerships in the 1970's. Jay Hoyt is not a partner in Hoyt & Sons. [3]
The Partnerships
In 1971 the Hoyts decided to expand their cattle operation. They raised the capital to do this by forming limited partnerships and selling interests therein to interested investors. The investors in these limited partnerships are mainly local people who know Jay Hoyt personally or *591 know someone who knows Jay Hoyt. The investors are primarily wage earners who were looking for an investment for their retirement. The first limited partnerships formed were Florin Farms #1, #2, #3, #4, and #5, respectively. They were formed in 1971. Certificates and Articles of Limited Partnership were filed in Sacramento County, California. Some of the partners in these partnerships were persons who had previously invested in Hoyt cattle. Those persons contributed their cattle to the partnerships as capital contributions. In 1973 Jay Hoyt formed another limited partnership, Durham Farms #1. In 1979 Jay Hoyt formed Durham Farms #2, #3, and #4, respectively. Certificates and Articles of Limited Partnership were filed in Washoe County, Nevada, for these partnerships. In 1975 Jay Hoyt formed limited partnerships entitled Washoe Ranches #1 and #2, respectively. In 1976 he formed the additional limited partnerships of Washoe Ranches #3, #4, #5, and #6. Certificates and Articles of Limited Partnership were filed in Washoe County, Nevada. Jay Hoyt is the general partner in all these limited partnerships. In later years he formed additional Durham Farms, Florin Farms, and *592 Washoe Ranches limited partnerships. The limited partnerships were formed to engage in the business of cattle breeding. The certificates and articles of limited partnership also constitute the partnership agreement. The partnership agreements grant the general partner a power of attorney on behalf of all the limited partners in the partnership. The agreements also set forth the allocation of profits, losses, and assets amongst the partners. In addition, the agreements give the general partner full, exclusive, and complete management and control over the affairs of the partnership. Further, the general partner has the sole authority to make decisions affecting the partnership. The agreements, in the portion applicable to limited partners, state that limited partners shall not take part in the management of the business or transact any business for the partnership. The limited partners may, by majority vote, remove the general partner from the partnership and elect a successor in interest. In order for a limited partner to assign his interest he must have prior written consent from the general partner. The agreements can be amended by an affirmative vote of partners owning a 50-percent *593 capital interest but only after the amendment has been proposed by a group of partners having at least a 40 percent capital interest. A partner cannot withdraw or have his interest redeemed unless the partnership dissolves. A partnership can only be dissolved by bankruptcy, receivership, dissolution by the general partner, or by written consent or vote by a group of partners having 66-2/3 percent of partnership capital. The partnerships would dissolve by their own terms in 1990. The agreements go on to state that if a partnership is dissolved, the general partner shall wind up the partnership's affairs, sell the assets after paying off all liabilities including the cost of dissolution, and then distribute the remainder to the limited partners as their interests appear. The general partner is fully liable for partnership debts. The Certificates and Articles of Limited Partnership were signed by Jay Hoyt as general partner and by Jay Hoyt as attorney-in-fact for each limited partner. These documents, along with the other relevant documents in these cases, were drafted by the Hoyts. They were laymen. No attorneys were employed to draft or assist in drafting these documents. *594 Persons interested in buying into one of the partnerships would sign a subscription agreement which stated that they intended to purchase X units of a limited partnership interest. The units are in denominations of $2,500. The units were to be paid off in five equal installments. In many instances, investors paid money to Jay Hoyt for partnership interests in a year prior to the year the subscription agreement was signed. The following example illustrates this. An investor wishes to buy into the Hoyts' cattle operation. He writes a check to Jay Hoyt for X dollars in December 1976. When Jay Hoyt prepared the investor's tax return the following spring, he would have the investor sign a subscription agreement which included the amount already purchased. The investor claimed the tax benefits of investing in the partnership in 1976. The investor would also grant Jay Hoyt a power of attorney orally when that investor purchased the partnership units. Jay Hoyt would use the power of attorney to sign the investor's name on the limited partnership's Certificate and Articles of Limited Partnership. In addition to his job as the promoter and general partner of these partnerships, *595 Jay Hoyt served as a tax preparer for the limited partnerships and for the investors personally. Although not required to do so, it appears that virtually all of the investors chose to have Jay Hoyt prepare their returns during the taxable years in issue. The return preparation service was a part of the entire investment package offered to the investors. Jay Hoyt tried to meet with each investor every year to report on the progress of the partnerships. In 1982 many of the limited partners executed instruments which either were to ratify previous oral agreements or modify previous written agreements. These changes were made after the Internal Revenue Service began its investigation of these partnerships in 1981. The new instruments included written powers of attorney authorizing Jay Hoyt to act as the limited partner's attorney-in-fact, declarations of limited partner, a subscription agreement, and a partnership agreement. Each of the partnerships elected the cash basis method of accounting on its partnership return for the years in issue. Sale of Cattle
The limited partnerships were formed to raise cattle. Breeding cows (heifers) were purchased from the Hoyt family, *596 i.e., Hoyt & Sons. Hoyt & Sons sold heifers to the partnerships in exchange for promissory notes for the entire purchase price. The sales were evidenced by a bill of sale. The bill of sale listed buyer and seller, the number of cattle sold, and the price per head. The seller on the bill of sale was usually "Hoyt & Sons" by either Steve Hoyt, Ric Hoyt, or Betty Jean Hoyt (Jay's wife). However, some of the bills of sales list the seller as W. J. Hoyt & Sons. Jay Hoyt did not sign any of the bills of sale on behalf of Hoyt & Sons. The buyer on the bills of sale would be one of the limited partnerships, Florin Farms #1, for example. The bills of sale did not identify the cattle individually. However, Ric Hoyt testified, and we have no reason to disbelieve him, that attached to each original bill of sale were the registration certificates to all the cattle sold in that particular transaction. The registration certificates identified the cattle sold. However, those registration papers were not attached to the bills of sale received into evidence as stipulated exhibits in these cases. Received into evidence as stipulated exhibits are inventory sheets which list the cattle purchased, *597 the year of purchase, and replacement cattle. The lists are by cow identification number. The registration number, name, and cow or sire's identification number are listed. Some of the purchases occurred in taxable years prior to the taxable years in issue. However, most purchases occurred during the taxable years in issue. The following table shows the number of cattle sold during the taxable years in issue [4] and the price paid per head: Number of Head
Price Per Head
1977
704
$3,500 66 2,000
1  1,500
18 700  1  600  2  500  2  250  5  200  2  100  1978
518
3,500
1  2,500
1  1,500
4  850  1  120  1979
258
4,000
464
3,500
2  1,250
1  1,100
1  1,000
3  750  2  250  Most of the cattle sold to the partnerships were represented on *598 the bills of sale to be registered Shorthorn heifers. Others were appendix registered and/or crossbred. Some were "grade" heifers. The seller in all but one of these sales was Hoyt & Sons. The one sale in which Hoyt & Sons was not the seller was a sale between A. Walker Ranches and Washoe Ranches #5. Forty-three head of cattle were sold in that transaction. A. Walker Ranches is owned by Albert C. Walker, Jr., a person unrelated to the Hoyts. In that sale, 32 2-3 year old bred heifers were sold for $2,500 per head, 11 2-3 year old bred heifers were sold for $3,000 per head, 9 one year old open heifers were sold for $1,500 per head, and one catch calf [5] was sold for $100. The terms of sale and the financing were the same as the transactions with Hoyt & Sons. A. Walker Ranches also managed at least some of these cattle. The notes which financed the purchase price called for interest to be paid at 6 percent per annum on the unpaid balance, the first *599 payment to begin one year after the note was signed. [6] Principal is to be paid off in equal installments with the first installment due usually five years after the note was signed. The lapse of time between the inception of the loan and principal payment date basically mirrors the interval between cattle generations, which is four to five years. [7]
The cattle purchase notes are to be paid off with calves raised by the partnerships and with cash contributed to the partnerships. [8] Proceeds from the sale of culled cows are also to be used to pay off principal but not interest on the notes. The partnerships deducted interest paid to Hoyt & Sons on their partnership tax returns. *600 There are no restrictions on the partnership's liability on the notes -- they are completely recourse. There are provisions in the notes which hold the limited partners personally liable on the notes. The limited partners chose to become personally liable on the notes in order to get an increase in their partnership basis. The notes themselves state that a limited partner is personally liable on the loan in the amount he assumes. The partnerships referred to this amount as the "atrisk" account. A limited partner, together with Jay Hoyt, would determine how much in losses he/she needed for that taxable year. The limited partner would then assume enough partnership debt to increase his basis enough to deduct the partnership losses previously determined. Liability allocations were done after the close of the tax year but before the return was filed. The allocations were done pursuant to an oral modification in the partnership agreement. Petitioners concede in their opening brief that these special and retroactive allocations are impermissible. As of trial, very few of the partnership notes had been paid off. Indeed, only interest had been paid on most notes; principal payments *601 had been made on very few notes. Nevertheless, it appears that the payment schedules have been followed on the notes. [9]
The partnerships deducted depreciation allowances on the breeding cattle. They used accelerated methods of depreciation, mainly 200 percent declining balance but also sum of the years digits, converting to straight line depreciation in later years. They used cost as basis and seven-year class life (1.21 asset guide line class per Rev. Proc. 77-10, 1977-1 C.B. 548, 552) as the useful life. The Bank Fiasco
In 1982 Hoyt & Sons had a run-in with one of their major creditors, First Interstate Bank. In that part of the country 1981 had been a drought year. Many of the bank's customers had gone broke as a result. The Bank was concerned that it did not have sufficient collateral to secure its line of credit with Hoyt & Sons. The bank did not have a security interest in the partnership notes. They pressured Hoyt & Sons to use some of the partnership cattle as collateral on the notes -- notwithstanding the fact that Hoyt & *602 Sons no longer owned the cattle. They also pressured Hoyt & Sons to amend the terms of the bills of sale. The amendment recognizes a pre-existing security interest in the partnership cattle by the bank. The Hoyts, not the bank, drafted the amending agreements. However, the bank had to "approve" the language in the agreements. The Hoyts claimed they were coerced into making the changes. The bank claimed that no duress was used to get the Hoyts to change the agreements. Anyone who reads those documents can readily tell that the bank's heavy hand was present when the new agreements were drafted. The changes (amended agreements) were never put into use. After all of this occurred, the Hoyts went out and negotiated a new loan from a different lender, Production Credit Association. They used the proceeds from that loan to pay down the loan from First Interstate Bank. The bank released its security interest in the partnership cattle. Hoyt & Sons later sued the bank for its conduct. That litigation was still pending at the time of trial in these consolidated cases. The Management Agreement
The limited partnerships themselves did not manage the cattle. The partnerships' *603 cattle were managed by W. J. Hoyt & Sons. W. J. Hoyt & Sons agreed to provide the management for all cattle owned by the partnerships, to pay all expenses [10] in managing the herd, and to provide breeding bulls (stud service). The partnerships paid for these services on a crop share basis, the crop being raised calves and culled cows. The calves paid to the management company were the calves left over after the herd had been increased by 10 percent with new calves (replacement heifers). The agreements were signed by Ric Hoyt on behalf of W. J. Hoyt & Sons and by Jay Hoyt on behalf of the limited partnerships. [11]
In 1976, Jay Hoyt formed W. J. Hoyt & Sons Management Company. Its purpose was to manage the partnership cattle. W. J. Hoyt & Sons Management Company is a Nevada Limited Partnership. Jay Hoyt is the general partner and the limited partnerships (i.e., Florin Farms #1 through #6, Durham Farms #1 through #4, Woshoe Ranches #1 *604 through #6) are each limited partners. On May 1, 1976, a new share crop operating agreement was entered into. It was similar to the previous agreement. Jay Hoyt signed the agreement on behalf of W. J. Hoyt & Sons and also on behalf of the limited partnerships. On January 1, 1978, another management agreement was entered into between W. J. Hoyt & Sons and each of the limited partnerships. The 1978 agreement is similar to the previous management agreements, but adds two new provisions. The first addition is that there will be allowed a 5-percent reduction for culled cows before the herd is increased by 10 percent with replacement heifers. This decreases the number of calves retained by the limited partnerships as compared to the prior arrangement. The second new provision is that W. J. Hoyt & Sons agrees to use the raised calves to: Pay when due, interest expense and principal payments on notes for the purchase of cattle owed by [the limited partnership] as they become due to [the limited partnership's] creditors. The amount of interest expense to be paid by the managers each year on behalf of [the limited partnership] will be negotiated each year and the amount will *605 reflect current market conditions of the cattle business and the number and value of registered cattle produced by [the limited partnership] herd that year. [12]
Although the agreements are between the limited partnerships and W. J. Hoyt & Sons, a Nevada partnership, not W. J. Hoyt & Sons Management Company, a Nevada limited partnership, we believe that W. J. Hoyt & Sons is the Nevada Limited Partnership management company. Both the management company's tax returns and the Articles of Limited Partnership refer to the entity as W. J. Hoyt & Sons. The management company incurred many expenses in managing the herd. Among these were labor, repairs and maintenance, interest, pasture rent, feed, supplies, etc. These expenses created large losses for the management company because it had very little revenue. The management company's losses passed through proportionately to its limited partners, which were the limited partnerships. The management company reported income from the sale of culled cows (reported as section 1231 *606 gains) [13] and from the sale of calves (reported as ordinary income). [14]
The management company listed a large asset on its return which was a debt due from the limited partnerships. We assume this debt is there to create basis in the limited partnerships so that they could claim the losses which passed through to them from the management company. There is no evidence of this debt in the record. Furthermore, there is no evidence that the limited partnerships contributed any capital to the management company to create basis in their partnership interests. Another expense of the management company was the guaranteed payments made to Jay Hoyt for his services as general partner. [15]
It is unclear *607 as to the total number of calves retained by the management company as payment for its management services under the share crop operation agreement. Nor do we know the price assigned to each calf transferred. Furthermore, it is unclear as to the number of calves transferred from the management company as an agent for the partnerships to Hoyt & Sons as payment on the notes. We do have in evidence an inventory sheet which lists documents given to respondent by attorneys for petitioners. The documents listed on the sheets are records of how many calves were kept as replacements, how many were given to the management company under the sharecrop operating agreement, and how many were given to Hoyt & Sons as payments on the notes (both principal and interest). The records themselves are not in evidence. The lists show the amount of calves transferred to each entity as follows: W. J. Hoyt & Sons
Management Company
Hoyt & Sons
Year
(Number of Head)
(Number of Head)
1980
633
234
1979
54 75 1978
172
73 1977
263
269
Even assuming these amounts to be genuine, we still do not know what the price per calf is. The price was to be negotiated *608 at the end of the year based on current market conditions. As for culled cattle used to pay principal on the notes, we do have some indication that the partnerships sold culled cows to Hoyt & Sons. These were cattle which did not fit the program. Many were heifers which did not become pregnant. There are some bills of sale which show the number of cattle sold back to Hoyt & Sons and the price per head. The Purebred Cattle Business
The partnerships in these cases raised Shorthorn cattle for which they paid top prices. Respondent determined that the price paid was excessive. Given these two diametrically opposed opinions, we must decide what the actual value was. However, before we can decide value we must ascertain what it is that petitioners purchased and what makes what they purchased valuable. Most cattle operations are commercial operations (96-97 percent). A commercial operator raises cattle to sell as beef. Those cattle derive their value then from the marketability of their beef. Accordingly, a commercial cattleman wants cattle that have marketable beef and that can be raised at the lowest cost possible. This means that commercial cattle must gain weight *609 rapidly but efficiently. For the most part commercial cattle are not purebred. The other type of cattle operation is a purebred operation (approximately 4 percent). Purebred operators, also known as seedstock producers, work with registered cattle. A seedstock producer reaps his profit, not from selling beef value like the commercial cattleman, but rather from selling breeding value to a buyer. A seedstock producer, in order to stay competitive, must react to changes in the marketplace by changing and improving the quality of his registered cattle herd. He accomplishes this by selective breeding and culling poorly performing cows. One important goal of any purebred breeding program is the consistency of desired traits. Consistency of traits enables a breeder to predict with some accuracy which traits will be passed from one generation to the next. Not all traits can be predicted with the same accuracy. The predictability of a trait is referred to as heritability. A trait which has a low heritability is one whose passage from one generation to the next cannot be predicted with much accuracy. Conversely, a trait with a high heritability is a trait whose passage from one generation *610 to the next can be predicted with some accuracy. Changes in traits from one generation to the next are caused by gene action. Predictability of important traits is vital because if a superior trait from a purebred animal is not passed on to its offspring, that purebred animal's superior genetics are of no value. This is so quite simply because the thing that gives the animal value is superior genetics but if those superior genetics cannot be predicted with some accuracy that animal has lost its breeding value. Another important goal of a purebred program is continued genetic improvement through selective breeding. In order to stay competitive, a seedstock producer must continually improve his product. Cattle which were considered top of the breed in 1950 would be considered "old-fashioned" and out of step with today's demands. For example, as beef consumers become increasingly aware of the health risks associated with fatty, high cholesterol foods the need to raise cattle with lean beef has become very important. Producing cattle that have leaner beef is done through selective breeding. In order for a breeder to make breeding decisions which result in calves with the desired *611 traits, a breeder must be experienced and have extensive records on his breeding stock. Without these records a breeder must guess. As previously stated, a purebred producer sells breeding value. Breeding value is determined by the relative quality of the genetics of the purebred animal. A purebred operator sells breeding value or superior genetics by selling bulls. Genetic progress is made primarily through bulls because one bull can have many offspring [16] in a single breeding season while a cow normally only has one offspring per breeding season. Accordingly, if a cattleman wants to improve the quality of his calves, the quickest way is through a good bull. The persons who purchase these bulls are generally commercial cattlemen. They use these bulls, known as range bulls, to impregnate their herd of cows. These cows then give birth to calves which are raised for beef. A good range bull can quickly improve the quality of the commercial cattleman's calf crop. For example, assume a commercial cattleman's calves are averaging *612 1,000 pounds yearling weight. The cattleman purchases a range bull whose yearling weight is 1,200 pounds. The calves sired by that bull, from the same cows as before, will weigh more than the calves who averaged 1,000 pound yearling weight but less than the bull's 1,200 lbs. yearling weight. If all this works, or in other words if the bull's genetics perform as predicted, the commercial cattleman should have heavier calves than before and therefore a more profitable operation. Therefore, what gives these range bulls their value is their ability, through superior genetics, to raise the average quality of a commercial cattleman's calf crop. There are exceptions to the aforementioned generalities regarding the productivity of bulls and cows. The exceptions are artificial insemination (AI) and embryo transplanting. AI is a procedure whereby semen is drawn off a bull and implanted in a cow's uterus. One bull's semen can be implanted in literally hundreds of cows. This procedure allows one bull to impregnate many more cows than he could by naturally servicing them. Because this procedure is very expensive it is only done on top of the line bulls. Embryo transplanting is a procedure *613 whereby a fertilized egg is removed from a cow and transplanted into another cow, referred to as the host cow. The host cow then carries the fertilized egg to term and gives birth to a calf with the donor cow's genetics. The genetics of the host cow are of no consequence. The main requirement is for the host cow to be healthy. What makes this procedure effective is that the donor cow can be injected with fertility hormones which cause that cow to superovulate. Superovulation occurs when many eggs become available for fertilization instead of the normal one egg per estrous cycle. After the cow super ovulates, the eggs are fertilized by AI, flushed from the donor cow and then implanted in host cows. This allows a single superior cow to produce many offspring in a single breeding season. Again, like AI it is very expensive and only done with top of the line cows. These new technologies notwithstanding, for the average commercial cattleman, the most economical way to increase the quality of a calf crop is by using a good range bull. AI and embryo transplanting are mainly used on purebred cattle for the purpose of genetic improvement. The Shorthorn Breed
The cattle sold in *614 these cases are of the Shorthorn breed. Shorthorn is one of three basic breeds raised in North America, the other two being Angus and Herefords. All three of these breeds originated from the United Kingdom. The Shorthorn breed is known primarily for its maternal traits. The Shorthorn breed, like many breeds, has a trade association which oversees it. The association is called the American Shorthorn Association (ASA). The ASA maintains a herdbook which is a record of all the Shorthorns registered with it. The ASA issues a registration certificate for a Shorthorn once the animal is recorded in the herdbook. A registration certificate contains the following information: birthdate, sex, tattoo, sire, dam, color, whether horned or polled, the breed's name, and the owner of the pedigree. It is a common industry practice to register cattle under a herd name even though the cattle are owned by someone else. In 1985 there were 18,201 Shorthorn registrations. Of these, 20-25 percent were on the appendix registry. On average, registrations are 1/3 male and 2/3 female. There is no way to determine how many Shorthorns there are and how many registered Shorthorns there are. This is *615 because not all Shorthorns are registered and the ASA does not know how many registered Shorthorns are still living. If the animal has 15/16th or more Shorthorn blood, then it can be registered as a purebred Shorthorn. If the animal's blood is between 1/2 and 15/16th Shorthorn, then it can be registered on the appendix registry as a percentage Shorthorn. Both the purebreed registry card and the appendix registry are part of the ASA herdbook. For example, if a purebred Shorthorn bull impregnates a Hereford cow, that calf will be 1/2 Shorthorn, 1/2 Hereford. The Calf can be registered on the appendix registry as 1/2 Shorthorn. If an animal looks Shorthorn, the ASA will register it on the appendix registry as 1/2 Shorthorn. Prior to 1983, if a calf's sire was from a multi-sire group, [17] the ASA would not recognize any Shorthorn blood from the paternal side even if all the bulls in the multi-sire group were purebred Shorthorn. However, as of January 1, 1983, the offspring from a multi-sire group are credited as being 1/4 Shorthorn on the paternal side. For example, if a purebred cow is impregnated by a multi-sire group all the bulls of which are pure Shorthorn, then the offspring *616 can be registered as 3/4 Shorthorn on the appendix registry. Prior to 1983 that same calf only would be eligible to be registered as 1/2 Shorthorn. The appendix registry is important because it allows a breeder to introduce new blood into his herd without losing the right to register the crossbred offspring as a Shorthorn. The introduction of new genetics into a herd through foreign blood is an important part of any purebred program. If the introduction of foreign blood were prohibited by the ASA, the gene pool of the Shorthorn breed would be fixed forever. If this were the case, it would be difficult for the breed to ever improve. However, allowing a breeder to introduce new genetics into his herd gives him the ability to *617 improve desirable traits and to change his product to conform to changes in the marketplace. As a matter of fact, few registered Shorthorns are "pure" or 100 percent Shorthorn. Most have some foreign blood, albeit a very small percentage, in their pedigree. When foreign blood is introduced by crossbreeding, it takes three generations to bring that crossbred back to full blood. [18]
The appendix program is an important tool for the seedstock producer. However, appendix cattle normally are not as valuable as purebred cattle. Although this is not always true it is true in most instances. What Factors Make Purebred Cattle Valuable?
As previously discussed, a seedstock producer makes money selling cattle with superior genetics. Therefore, the value of those purebred *618 cattle depends on the relative quality of the genetics they possess. Genetics themselves cannot be seen. However, they manifest themselves in the physical traits of the cattle. So we determine value by ascertaining which traits are important and then comparing those traits amongst cattle. The cattle with superior traits are the most valuable. The experts in these consolidated cases all had their own opinions as to what factors are most important in determining the value of purebred cattle. From those experts' opinions, we have determined that the following factors are most important: performance records, production records, ancestry, phenotype, and reputation of the breeder. Performance records are records of the animal being evaluated. Those records include: birth weight, weaning weight (205 days), yearling weight (365 days), feed lot performance, carcass data (mainly on slaughtered steers), testicle size (bulls), and milking ability (cows). Birth weight is important because it helps determine calving ease. Difficult calving can cause calf death. Too many calving deaths can put a cattleman out of business. Weaning weight is important because it shows how fast that calf *619 gains on milk. Yearling weight is of similar importance because it shows how fast a calf gains weight. Feed lot performance shows how efficiently a calf gains weight. Carcass data shows the quality and marketability of the beef. Testicle size (scrotal circumference) helps determine how fertile a bull is. A bull which cannot service many cows is much less valuable. Milking ability is an important trait in cows because it determines how fast that cow's calf will gain weight. Production records are records of the evaluated animal's offspring. Those records, which are basically performance records of the calf, show how that animal has performed as a parent. Both production and performance records are important in evaluating the quality of a particular animal's genetics. These records are difficult and expensive to keep. However, they need to be there and in an organized and usable fashion. Ancestry is the lineal heritage, also known as the bloodline, of the evaluated animal. If the animal has superior ancestors, it is more likely to be superior itself. Ancestry also shows if there are deficiencies in the animal's bloodline. A Shorthorn registration paper shows ancestry *620 four generations back. Many breeders keep more extensive records of ancestry. Phenotype refers to the physical characteristics of the animal. By looking at an animal the trained eye can determine, to a degree, structural soundness, feet and legs, design, the environment in which the animal was raised, testicles, and maternal performance. Physical appearance cannot determine how a heifer will perform as a parent. The experts put different emphasis on the importance of physical appearance. One thought it was of paramount importance while others thought it was a consideration, but only one of many. The latter group of experts put more emphasis on record keeping and what the records show. And finally, reputation of the breeder is an important factor in determining the value of purebred cattle. If the breeder does not enjoy a good reputation, then the records he keeps are not worth the paper they are written on. And, without reliable records the only factor left to determine value is physical appearance. Records are easy to manipulate. They can be actual fraudulent entries or mere "fudged" entries. A breeder's reputation is usually spread by word of mouth. There are a finite *621 number of people who are in the registered cattle business. If one of those persons develops a bad reputation, it spreads quickly to others. Outside persons interested in purchasing cattle from a breeder can easily find out if a breeder has a bad reputation. The Cattle Markets
Registered cattle are sold in two types of markets. One is public, i.e., at auction, and the other is private, i.e. a private treaty sale. A wide variety of cattle are sold at auctions. Cattle sold at auctions range from top quality cattle to culled cattle, cripples, and old worn-out cows. Auction sales account for approximately 25 percent of all sales. Most auction sales, 97-98 percent, are reported in the ASA publication, The Shorthorn Country.
The remaining 75 percent of sales are private treaty sales. These are sales of cattle done privately between buyer and seller. Cattle which bring top dollar are usually sold at private treaty sales. It is not uncommon for the prices at these sales to be two to three times auction prices. Most of these sales are done orally. These sales are not reported in The Shorthorn Country.
The Hoyt Operation
Ric Hoyt is principally in charge of *622 the operational end of the cattle ranch. The Hoyt cattle ranch includes the partnership cattle, Hoyt & Son's cattle, and W. J. Hoyt Sons Management Company's cattle. The cattle are commingled and spread throughout the ranch. The ranch is located in Burns, Oregon, a very rural, arrid and rugged area of southeast Oregon. Many areas of the ranch are so remote that they can only be reached on horseback. The Hoyts have a remuda of 90 horses which they use to reach those areas of the ranch and work the cattle. The Hoyts moved their operation to Burns from Northern California in 1975 because land prices became too expensive in northern California. Ric Hoyt is eminently experienced in the Shorthorn breed. In 1985 he received the Beef Improvement Federation's award of Seedstock Producer of the Year for 1984. The award is given in recognition of the accomplishments of a successful cattle breeder. The award is for all cattle breeds. Each breed association nominates one breeder out of thousands of breeders in that breed. A winner is then selected from those persons. Receipt of the award is very prestigious within the industry. In addition to his BIF award, Ric Hoyt has distinguished himself *623 as a knowledgeable cattleman by sitting on the Board of Directors of the National Cattlemen's Association, the American Shorthorn Association, the Oregon Cattlemen's Association and the Pacific International Livestock Exposition. He is past president of the American Shorthorn Association and of the Harney County Stock Growers. He has served as an advisor to various agricultural subcommittees of the Congress and has judged in many livestock shows. The Hoyt operation keeps extensive written records on all of their cattle breeding activities. They keep records of birth weight, [19] weaning weight, and yearling weight. They keep records of carcass evaluations and feed lot performance. The production and performance records are kept in a large airplane hanger on 29 tables, organized by partnership. Not only are the Hoyt records one of the most extensive sets of records maintained in the Shorthorn breed, they are in fact one of the most extensive sets of records of any breed in the United States. The Hoyts also have extended *624 pedigrees on many of their animals. The extended pedigree lists six generations of ancestors as opposed to the normal four listed on an ASA registration certificate. Not all Hoyt Shorthorn cattle are registered with the ASA. Some of their cattle have Hoyt certificates instead. A Hoyt certificate contains the same information as an ASA registration certificate, but also includes ancestors which are non-Shorthorn. Most of the cattle which only have Hoyt certificates could be registered with the ASA on the appendix registry. The Hoyts use their own certificates on calves sired from multi-sire groups because those bulls at one time were not recognized by the ASA. Another reason the Hoyts use their own certificates is cost. A single registration is not expensive but when done on a large scale it becomes quite expensive. Still, the Hoyts register more Shorthorn cattle than any other Shorthorn breeder. The Hoyts use an extensive carcass evaluation system and are also involved in a young sire testing program which evaluates young bulls. The Hoyts are known as the bull factory salespeople of the Shorthorn breed. Their bulls consistently bring top dollar. At sales, range bulls *625 sell, on average, for $1,300-$1,800 per bull. Hoyt & Sons' bulls sell for an average of 20-40 percent higher than that. The Hoyts sell over 500 range bulls per year. The cattle owned by the partnerships are registered with the ASA under the name W. J. Hoyt & Sons, not under the limited partnership's name. This is a common industry practice. The explanation for this, offered by Ric Hoyt, is that the Hoyt name adds value to the animal. If, for example, a bull calf is for sale and the owner is listed as Florin Farms #1, a prospective buyer is going to be wary of paying top dollar because that buyer knows nothing about the breeder. If, however, that same animal is listed as being owned by W. J. Hoyt & Sons, a prospective buyer who knows of the Hoyt reputation is more likely to pay top dollar for that bull. As previously explained, reputation of the breeder is a very important consideration in determining the value of registered cattle. The Hoyts actively cultivate their good reputation as Shorthorn breeders by aggressively marketing their product. [20]
*626 Hoyt & Sons has a 10-year fertility warranty on all heifers it sells. If a cow does not conceive during any given breeding season, the Hoyts will replace her. The warranty does not guarantee a live calf, only that the cow will conceive. The standard ASA fertility warranty is for six months. The Hoyts employ both AI and embryo transplanting in their operations. These procedures are done only on very high quality cattle. These procedures help them make maximum use of their finest cattle. At a November 1984, production sale (detailed infra) Hoyt embryos sold for $3,550 and $3,150, respectively. It is unclear whether the host cows were included. Another embryo sold for $6,250 at the same sale. The host cow was included in that sale. The embryo transplanting procedure used in the operation explains the existence of some of the low quality cows on the ranch. It should be remembered that the host cow can be of any description. Its genetics does not matter. The use of AI is also important because it allows the Hoyts to impregnate the partnership cattle with the finest bulls. It is important to keep in mind that part of the management agreement called for the management company *627 to provide stud service for the partnership cattle. Cattle Prices and the Value of the Partnership Cattle
The cattle sold to the partnerships were mainly 2-3 year old heifers. The heifers were either bred or open (not yet bred). Most of the heifers were registered; some were appendix registered. If not actually registered, most of these heifers could be registered. The partnerships' cattle were evaluated by six experts, all of whom testified in these cases. Not all six gave a dollar value of the cattle. The experts who did value the cattle all had the same problem when it came to appraising the value of cattle during 1977-1979 in 1985. In other words, the experts inspected the cattle in 1985 but were trying to determine what they would have been worth during 1977-1979. Not only had prices changed during that time but the cattle themselves had changed because the herd itself was constantly being replenished with new heifers. Fortunately, many of the cattle on the ranch in 1985 were the progeny of the cattle on the ranch during 1977-1979. These cattle should be similar, which helps, but nevertheless the herd had changed in the intervening years. The experts overcame *628 the price change obstacle in one of two ways. One way was to value the cattle as of 1985 and then adjust that price back to 1977-1979 using some type of factor. The other way was to determine what prices were during 1977-1979 and comparing them to the partnerships' cattle. The first method assumes that the appraiser knows what the cattle are worth today and what the proper discount factor is. The second assumes that the appraiser knows what cattle were selling for during 1977-1979 and how the partnerships' cattle compared with those sold during 1977-1979. Experts for petitioners, John Coote (who did not testify at trial) and Joe Garrett, along with Ric Hoyt and Jay Hoyt and expert for respondent, Dr. C. K. Allen, inspected a portion of the cattle herd at the ranch on July 14, 1985. They intended to see a random sample [21] of the herd as determined by a statistician at the Internal Revenue Service. However, when they arrived at the ranch they abandoned that plan and looked at only a few ranges and pastures of cattle. *629 In addition to Joe Garrett and Dr. Allen, Dr. William Hunsley, Don Cagwin, and Bill Lefty all gave expert opinions as to the value of the cattle sold to the breeding partnerships in question. All of petitioners' experts have dealt with the Hoyts for years. They have observed the Hoyt cattle on many occasions. Expert for respondent, Dr. Allen, had never seen the partnerships' cattle prior to his inspection on July 14. William Lefty, an expert for petitioners, is an auctioneer who has bought and sold many cattle over the years. He is very knowledgeable of prices received at Shorthorn sales. He testified that the Hoyt bulls were the finest Shorthorn range bulls available. He testified, based on the assumption that a Hoyt bull calf could be sold at $100-$150 profit and that a suitable replacement heifer could be produced, that the cow that produced those would be worth $3,800. Another expert for petitioners, Mike Dugdale, similarly testified that a cow was worth $4,000 based on the present value of the profits she would reap from the sale of her calves. Mike Dugdale manages the Hoyt cattle at their new Blair, Nebraska, ranch. Dr. Roger Hunsley, another expert for petitioners, *630 is the Executive Director of the ASA. He assumed that position on May 1, 1983. He testified that the cattle were in the top 20 percent of the breed or maybe in the top 10 percent of the breed. He valued the herd at $4,000/head in 1985. To arrive at a value for 1977-1979 he deducted 25 percent to arrive at a value of $3,000/head ($4,000 - (25%) X (4,000)). Petitioners' next expert was Dr. Joe Garrett. Dr. Joe Garrett valued 304 2-3 year old heifers. He selected the 304 head out of a larger group. He determined their value to be $4,000/head as of 1985. He then determined that those heifers would be worth $2,800/head during 1977-1979. He used an inflation rate of 4.5 percent annually working backwards to arrive at the 1977-1979 figure. Don Cagwin, also an expert for petitioner, is president and owner of his own sales management company. He valued the cattle at $4,075/head as of 1981. He determined that price by arriving at a replacement cost and then adding a value for the Hoyts' reputation as cattle breeders. He determined that the replacement cost would be $2,750 and that the Hoyt reputation was worth $1,325. Respondent's expert, Dr. C. K. Allen, used market quotes during *631 1977-1979 as a gauge to determine his value. He determined the value of the cows as of 1977-1979 using prices during those years quoted in The Shorthorn Country.[22] Using those prices he determined that, on average, the partnership cattle were worth $652 in 1977, $891 in 1978 and $1,249 in 1979 for registered Shorthorns and $430 for 1977, $600 for 1978 and $850 for 1979 for appendix registered Shorthorns. In determining value, Dr. Allen split up the cattle by partnerships. He then graded the cattle sold to each partnership on the following scale: substantially below average, below average, average, above average, substantially above average, and top of the breed. He placed the bulk of the cattle in the average and above average categories. The other categories each had a few animals in them. Dr. Allen used the following prices for the category "top of the breed:" $3,325 for 1977, $3,540 for *632 1978 and $3,755 for 1979, respectively. Dr. Allen testified that the partnership cattle were in the top 30 percent of the breed, i.e., superior to 70 percent of Shorthorn cattle. Unlike petitioners' experts, Dr. Allen based his appraisal on physical appearance alone. He did not examine any production records or performance records. [23] He did see a few pedigree and carcass evaluations. In addition to the experts' opinion as to value, we have records of actual cattle sales in evidence. In November 1984, the Hoyts had a production sale. At that sale they sold a number of cattle including a complete dispersion of Florin Farms #3 cattle. The Hoyts received an average price of $3,232 per head for heifers. The heifers were either open or bred. The bred heifers brought more on average than the *633 open heifers did. There were 56 heifers sold at that sale. At that sale the Hoyts sold a very valuable cow, Mill Brook Tulip 78 X, for $31,000. She had been used as a donor embryo transplant cow. She had not been bred by the Hoyts. The Hoyts also sold five cows for an average of $5,070 per head. Also in evidence is a list of Shorthorn sales reported to the ASA. Included in that list is an entry which reports that the Hoyts sold 60.9 lots [24] in 1984 for an average price of $4,796 per lot. All the lots were female. It is unclear whether the sales from the November 1984 sale are included in these sales reported to the ASA. In December 1985, the Hoyts had another sale which included a dispersal of all Florin Farms #4 cattle. The cows sold for an average of $3,631 per head. However, if we remove two sales which brought much higher prices than the others ($19,000 and $10,000 respectively), the average was $2,423 per head. Also included in the December 1985 sale is the sale of *634 22 heifers. The sale catalog does not indicate whether the heifers were open or bred. The average price for the 22 heifers was $3,528 per head. Again, if we remove three high sales from the average ($21,000, $8,750 and $10,000, respectively), we get an average of $1,981 per head. OPINION We must decide whether petitioners are entitled to claim certain credits and to deduct various expenses incurred as a result of their investments in Hoyt Farms breeding limited partnerships. Respondent, in his statutory notices of deficiency issued to petitioners in these cases, disallowed the losses claimed by petitioners on the grounds that the transactions were not bona fide arm's length transactions at fair market value, that there was not a bona fide transfer of the benefits and burdens of ownership of cattle, or that the transactions had any economic substance other than the avoidance of taxes. Respondent also disallowed the claimed losses on the ground that the transactions were not entered into for profit. Respondent further contends in his statutory notices that, if he is not sustained on the abovementioned theories: (1) petitioners failed to prove that the partnership expenses were *635 paid or incurred, or if paid or incurred were ordinary and necessary; (2) the portion of the losses attributed to interest expenses is not allowed because petitioners failed to establish that said expenses were paid or incurred for the claimed purposes or that a bona fide debtor-creditor relationship existed; [25] (3) the portion of the losses attributed to depreciation is not allowed because petitioners failed to prove that there was a bona fide sale, that petitioners have not established a proper cost basis, a proper method of depreciation, or a proper useful life, that petitioners were guaranteed or insured against any loss from depreciation of cattle; [26] (4) the portion of the loss, if any, attributed to the management fee is not allowed in full because it has not been established that such expense was incurred, or if incurred was expended for an ordinary and necessary business expense, or that said expense is anything other than a capital expenditure. [27]
*636 As for the investment tax credit, respondent disallowed the credit claiming that petitioners failed to prove that the property qualified for the credit, or the cost basis or useful life of the property, or in what year the property was placed in service. [28]
Respondent's last determination in his statutory notices of deficiency is that any gains from the disposition of the cattle do not qualify for capital gain treatment and that said gains are ordinary income. [29]
In addition, respondent claimed an increased rate of interest under section 6621(c) in these cases. This issue was not raised in the statutory notices of deficiency; it was raised by respondent in an amendment to his answer. Petitioners bear the burden of proof in these cases on all issues except as to the increased rate of interest under section 6621. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). It is well settled that the economic substance of a *637 transaction, rather than its form, controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935). Although a taxpayer is entitled to reduce his taxes by any means that the law allows, "the question for determination is whether what was done, apart from tax motive, was the thing which the statute intended." Gregory v. Helvering,supra at 469. The labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with economic realities and not the form employed by the parties. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on other grounds, 544 F.2d 1045 (9th Cir. 1976). In Frank Lyon Co., the Supreme Court summarized these principles as follows: This Court, almost 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed -- the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 378 (1930). *638 In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., Commissioner v. Sunnen,333 U.S. 591 (1948); Helvering v. Clifford,309 U.S. 331 (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," Commissioner v. Tower,327 U.S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S., at 255. See also Commissioner v. P.G. Lake, Inc.,356 U.S. 260, 266-267 (1958); Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945). Nor *639 is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner v. Duberstein,363 U.S. 278, 286 (1960). [435 U.S. at 572-573.] Our first inquiry is whether these transactions are so lacking in economic substance as to be considered economic shams. [30] A transaction which is devoid of economic substance is not recognized for tax purposes. Frank Lyon Co. v. United States,supra at 573. Furthermore, the mere presence of an individual's subjective profit objective will not require us to recognize, for tax purposes, a transaction which lacks economic substance. Cherin v. Commissioner,89 T.C. 986, 993 (1987). Before we decide petitioners' motives for entering into a transaction, we must decide if that transaction had economic substance. Cherin v. Commissioner,supra at 993. In deciding whether a transaction has economic *640 substance, we place greater weight on objective facts such as: the relationship between sales price and fair market value, the financing structure, whether the benefits and burdens of ownership shifted, and whether the parties adhered to the contractual terms. Cherin v. Commissioner,supra.
We will first decide whether the sales price of the cattle was within a reasonable range of their value since a normal attribute of a true arm's length sale is a purchase price at least approximately equal to FMV. Grodt & McKay Realty, Inc., v. Commissioner,77 T.C. 1221, 1240-1241 (1981). The exact prices paid for the cattle in these cases are set out in our findings of fact, supra. To summarize, the top price paid for the cattle in 1977 and 1978 was $3,500 per head and $4,000 per head in 1979. Most of the cattle were sold for $3,500 per head. Most of the cattle sold were 2-3 year old heifers. Some were bred, some were not. Most of the heifers were registered Shorthorn, especially those which were sold at the highest prices. Others were appendix registered. A few were not registered. In order to decide the dollar value of these cattle we must *641 find two things. Number one is the relative quality of these cattle compared to the Shorthorn breed in general. Number two is the price which cattle of that relative quality brought on average during 1977-1979. Needless to say these cattle are above average Shorthorns. Even respondent's expert, Dr. Allen, opined that these cattle were in the top 30 percent of the breed. Petitioners' experts were more generous. They put the cattle, on average, at or near the top of the breed. The Hoyt cattle operation, which encompasses the partnerships' cattle, is surely one of the top Shorthorn seedstock operations in the United States. Ric Hoyt is a leader within the industry. This is apparent from his long list of accomplishments which is topped off by his BIF award for top seedstock producer of the year for 1984. His operation is both well managed and innovative. For example, he used the multi-sire stud group to utilize large pastures without sacrificing selective breeding before that procedure was sanctioned by the ASA. The Hoyt operation utilizes all of the generally recognized tools for registered cattle breeding. They keep extensive production records, performance records, and *642 pedigrees. They also use carcass evaluations and feedlot performance data to make breeding decisions. Breeding cattle derive their value from their ability to pass on superior genetic traits. This is done primarily through the sale of range bulls. Consequently how the "markets" rate breeding value can be determined by how the "markets" price Hoyt range bulls as compared to other range bulls. Hoyt range bulls consistently bring top dollar at sales. The Hoyts are known as the "bull factory salesperson" of the breed. This is very persuasive evidence of the fact that the "markets" have valued the genetic potential of the Hoyt breeding cows at the top of the breed. Not only is this a quality operation, it is also a large operation. The Hoyts register more Shorthorns per year than any other Shorthorn producer. They sell approximately five hundred range bulls per year. In our mind there is not much doubt as to the quality of this herd. The remaining and harder question is, what were cattle of this quality worth during 1977-1979. Respondent's expert, Dr. Allen, determined that the cattle purchased were worth $652 in 1977, $891 in 1978 and $1,249 in 1979. He placed each animal *643 in a category from substantially below value to top of the breed and then compared each category to average prices at auction sales quoted in The Shorthorn Country.
Dr. Allen placed a majority of the cattle in the average and above average categories. Yet he testified at trial that the herd was in the top 30 percent of the breed. This is inconsistent. If the herd is in the top 30 percent of the breed, then we would assume that they should be in the substantially above average and above average categories. How can cattle which are average be in the top 30 percent of the breed? We do not question Dr. Allen's credibility. He was a fine witness, thoroughly knowledgeable of the subject matter of his testimony. His inconsistency can be explained by the fact that his original opinion, which placed a majority of the cattle in the average to above average categories, is contained in his expert's report. That report was done after he physically inspected a portion of the herd. In compiling his report he was deprived of the opportunity to view the breeding records of the cattle because respondent lost or misplaced the copies given to him. His report was based on phenotype alone, *644 which is not as good an indicator of value as production records, performance records, and pedigrees. When Dr. Allen testified at trial he had the benefit of sitting in the courtroom listening to other experts discuss the extensive breeding records of the operation and other factors which make breeding cattle more or less valuable. After hearing this information he testified that the herd was in the top 30 percent of the breed. We have no doubt that had Dr. Allen had the benefit of this information when compiling his expert report he would have placed the cattle in categories which would be consistent with his opinion that the cattle were in the top 30 percent of the breed. In his expert's report, after having decided the relative quality of the cattle, Dr. Allen arrived at a dollar value using auction prices reported to the ASA and published in The Shorthorn Country. The auction prices are averages. They include sales of heifers and cows. The quality ranges from first rate to culled cattle, crippled and old cows headed for the "Golden Arches." Furthermore, auction sales only comprise 25 percent of all Shorthorn cattle sales. The remaining 75 percent of Shorthorn sales are *645 private treaty sales. These are not reported to the ASA. These sales are often of higher quality cattle. It is not uncommon for cattle sold at these sales to bring prices 2-3 times prices paid at auction. Dr. Allen did not take these sales into account when valuing the cattle. Using auction prices exclusively in this case is just simply not adequate because those prices do not accurately reflect prices paid for Shorthorn heifers. Therefore, because of that error in Dr. Allen's pricing method, we attach little weight to his opinion as to prices these cattle would have brought at a sale during 1977-1979. Fortunately, in these cases we have the benefit of a few actual sales to help us in our inquiry as to the value of the cattle. In the 1984 production sale the Hoyts sold 56 heifers including a complete dispersal of all Florin Farms #3 cattle. Those heifers brought an average of $3,232 per head. The heifers comprising this average range quite a bit in quality. The Hoyts sold one cow for $31,000. This price is obviously on the high end of the price scale. In addition, the Hoyts sold five cows for an average of $5,070 per head. In the 1985 sale the average price, excluding two *646 high sales of $19,000 and $10,000 respectively, was $2,423 per head for cows. The average price for 22 heifers was $1,981 per head excluding three high sales of $21,000, $8,750 and $10,000 respectively. And finally there is an ASA auction sales list which shows that the Hoyts sold 60.9 female lots in 1984 for an average of $4,796 per lot. Unfortunately it is difficult to compare the cattle sold at these sales to the partnerships' cattle because we do not know the relative quality of the two. We do know that the partnerships retained the best heifers in their herds as replacement cattle. We therefore can infer that the cattle sold off were of lower quality, especially those which brought the lower prices. We think it is safe to assume that the cattle sold at these sales were not of higher quality on average than the partnerships' cattle. Furthermore, the high-priced cattle sold show us that the herd contained some very valuable cattle and that it is not uncommon for a single breeding cow to bring a price of $10,000 or even $20,000. A second more troublesome problem is that the sales described above are for sales that occurred in 1984 and 1985. The experts also valued the cattle *647 as of 1985. We must decide the value of the cattle as of 1977 through 1979. For this Task we turn to petitioners' experts. [31]
Dr. Roger Hunsley, Executive Secretary for the ASA, used a discount factor of 25 percent to arrive at a price for 1977-1979. Dr. Joe Garrett, Executive Vice President of the American International Charolais Association, used a discount factor of 4.5 percent per year. If we compound this over seven years, we come up with a discount factor of 31 percent. Dr. Hunsley is a leading expert in the Shorthorn breed and is very knowledgeable of the market for Shorthorn cattle over the years. We place more emphasis on Dr. Hunsley's opinion because he is more knowledgeable of the market for registered Shorthorns than Dr. *648 Garrett, whose expertise is primarily in the Charolais market. If we apply Dr. Hunsley's 25 percent discount factor to the actual sales previously described, we come up with the following values: As for the prices reported to the ASA, 75 percent of $4,796 is $3,597. As for the prices listed on the 1985 sale, 75 percent of $1,981 is $1,485.75 and 75 percent of $2,423 is $1,817.25. As for the 1984 production sale, 75 percent of $3,232 is $2,424 for the heifers and 75 percent of $5,070 is $3,802.25. After sifting through all of this information it is our considered opinion that the stated sales price for these cattle is within a reasonable range of their actual or fair market value. Petitioners put on a vast quantity of evidence showing that they priced the cattle accurately. Respondent has not offered sufficient evidence to show that this was anything but a first class purebred Shorthorn operation. Even respondent's expert testified that the herd was in the top 30 percent of the breed. Furthermore, the fact that the cattle were fairly priced also tends to show that these sales were negotiated at arm's length. The same is true of the sale to Washoe Ranch #5 by A. Walker Ranches. *649 The seller in that transaction was an independent third party who negotiated the same terms as Hoyt & Sons did. The fact that an independent third party negotiated the same deal shows that the sales were negotiated at arm's length. The next factor relevant in deciding whether these transactions lacked economic substance is the structure of the financing. In Cherin v. Commissioner,supra, the purported purchases of the cattle were financed with nonrecourse indebtedness. That fact, along with the fact that the purchase price was greatly inflated, caused us to inquire whether the indebtedness itself had any economic substance. We went on to decide that since the indebtedness greatly exceeded the value of the assets and that the investors would never pay off the purchase price, nor would they receive any proceeds from the sale of the cattle, that the transaction lacked economic substance. That simply is not the case here. In these cases the financing was recourse but more importantly the outstanding debt balance did not exceed the FMV of the cattle. Because of that it is possible for petitioners to build up equity over time. If they walked away from the deal *650 they might lose more than their investment; they could lose any built-up equity in the herd. Simply put, the structure of the financing does not help persuade us that these transactions lacked economic substance as the structure of the financing did in Cherin.
The next factor we need to address to help us determine whether these transactions lacked economic substance is whether the benefits and burdens of ownership transferred from seller to buyer. This is a question of fact. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). We will use the following items to help us in deciding the issue: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether the purported purchaser acquires any equity in the property; (4) whether the contract creates a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party bears the risk of loss or damage to the property; and (7) which party receives the profits from the sale of the property. Grodt & McKay Realty, Inc. v. Commissioner,supra at 1237-1238. (1) Whether *651 Legal Title Passes
In these cases the cattle were sold to the partnerships by Hoyt & Sons via bills of sale. These bills of sale list the number of cattle purchased and the price. The cattle were not individually identified. However, attached to the original bills of sale were the registration papers for the cattle sold. There were no restrictions, reservations, conditions precedent, etc. involving the sales. Accordingly, legal title passed at the time of contracting. U.C.C. section 2-401. [32]
(2) How The Parties Treat The Transactions
In these cases the parties to the transactions treated the transactions as sales. The only evidence to the contrary is the bank fiasco. In 1982 the Hoyts used some of the partnership cattle as collateral on a loan to Hoyt & Sons from First Interstate Bank. There is every indication *652 that the Hoyts were forced into this situation. At the first opportunity they negotiated a new loan with another lender and got the liens released. This is a single episode, not a continuing course of conduct. This simply does not persuade us that the Hoyts disregarded the sale of the cattle to the partnerships. In fact they did everything in their power to preserve the partnerships' rights in the cattle. Respondent contends that since Hoyt & Sons did not register the cattle in the partnerships' names at the time of sale or thereafter that the failure to do so shows that Hoyt & Sons did not respect the sale. At first blush this seems like a very convincing argument. Yet, if we probe beneath the surface, we find that it is a common industry practice to register cattle under a herd name even though the herd name is not the same as the true owner. Ric Hoyt testified that the name "Hoyt & Sons" adds value to the herd. The experts agreed with that assessment. Common sense tells us that a buyer would pay more for a bull registered under the name of Hoyt & Sons than a bull registered under the name of Washoe Ranches #3, since very few buyers would have heard of the latter while many *653 are familiar with the former. And, since reputation of the breeder is such an important factor in bringing top prices, using a name without any reputation would be self-destructive. Accordingly, the mere fact that the cattle were registered under the name Hoyt & Sons or some derivation thereof does not persuade us that the Hoyts disregarded the partnerships' rights in the cattle. [33]
(3) Whether The Purported Purchaser Acquires Any Equity In The Property.
Petitioners did not acquire any equity in the cattle at the time of purchase. The sale was 100 percent *654 leveraged. However, because the amounts of the loans were within a reasonable range of the cattle's FMV, it was possible for petitioners to build up equity over time as the principal payments were made. In addition, the replacement cattle retained by the partnerships in excess of the culled cattle may be viewed as increases in equity in the herd. So, over time, not only can the partnerships build up equity by paying off the loans, they can also build up equity by increasing the herd. (4) Whether The Contract Creates A Present Obligation On The Purchaser To Make Payments.
The notes accompanying the bills of sale require that interest be paid beginning one year after the sale and that principal be paid beginning five years after the sale. The financing was set up that way because it takes approximately that long for a calf to become a cow whose offspring can be sold. It appears that the notes were being timely paid in these cases. Clearly, there is a present obligation to make payments. But more importantly, there is every indication that the payments were actually being made. (5) Whether The Right Of Possession Is Vested In The Purchaser.
The Purchasers *655 in these cases are the partnerships. The entity which controlled the cattle and the day to day business decisions of the operation was the management company. Both the limited partnerships and the management company were controlled by Jay Hoyt. He made all the decisions concerning which cows were retained and which were culled. He decided which raised calves were used as replacements and which were used as payments on the notes and payment for management services. Given this structure, it would have been quite possible for Jay Hoyt to manipulate things to his own advantage. Yet there is no indication that he did so. In fact, the evidence in the record shows that he ran the operation for the investors' benefit. It is important to keep in mind that the seller is not the same person as the manager of the herd. Hoyt & Sons was the seller; Jay Hoyt was not a partner in that partnership. While it is true that he was related by blood or marriage to all the partners in Hoyt & Sons, there is no indication that he ran the operation for their benefit at the expense of his investors. It appears that the cattle were never physically moved at the time of or after the sales. Furthermore, *656 all the cattle were commingled throughout the ranch. However, the partnership cattle were easily identifiable by matching their ear tag number to the partnership inventory list. Ric Hoyt never claimed an ownership interest. The investors, petitioners in these cases, were limited partners. By the very nature of their investment they were not entitled to participate in the day to day operations of the partnerships. Only Jay Hoyt had that right. It is clear that he ran the operation and was in possession of the purchased cattle. The right of possession did not remain with the seller partnership, Hoyt & Sons. (6) Which Party Bears The Risk Of Loss Or Damage To The Property.
The sales in these cases included a ten-year fertility warranty. If the cow does not conceive at any time during the ten-year period, the seller will replace her. This does not keep the risk of loss with the seller. In the event a cow is stolen or dies from lightning, disease, or some other calamity, the risk of loss is on the limited partnerships. [34] There are no stop loss agreements. The risk of loss is on the purchasers. *657 (7) Which Party Receives The Profits From The Sale Of The Property.
In the event of a liquidation, the seller (who is the obligee on the note) would receive an amount which would pay off the outstanding balance on the notes. If there were any proceeds left over, that amount would be distributed to the limited partners. It is possible for petitioners to receive something at liquidation because of their equity in the cattle. If an animal is sold during the continuing existence of the partnership, the proceeds would go toward paying off the note. To say, however, that the proceeds are retained by Hoyt & Sons is misleading. The proceeds which go to Hoyt & Sons reduces the debt which builds equity in the cattle. After reviewing the seven factors noted in Grodt & McKay Realty, Inc. v. Commissioner,supra, we have decided that a true sale occurred with regard to the transfer of cattle from Hoyt & Sons to the limited partnerships. The last factor we will look at is whether the parties followed the contractual terms of the agreements. The bills of sale, notes, management agreements, certificates, and articles of limited partnership (which are the partnership *658 agreements) were all written by laymen. Although not perfect, the documents do convey the intentions of the parties. There is every indication that the terms were followed. The seller sold the cattle listed in the bills of sale. The partnerships paid on the notes according to their terms. Jay Hoyt managed the herd as he promised. Although deviations from the terms of the documents may have occurred, no deviations were brought to our attention which would bring into question the validity of these transactions as true sales. After reviewing the facts in these cases and based on the foregoing analysis, it is our opinion that these transactions clearly had economic substance. Accordingly, the transactions will not be disregarded as shams. Respondent also disallowed the deductions in these cases under section 183, determining that petitioners were not engaged in an activity for profit. An "activity not engaged in for profit" is defined in section 183(c) as an activity other than one with respect to which deductions are allowable under section 162 or under paragraphs (1) or (2) of section 212. We decide whether the activity was engaged in for profit at the partnership level. *659 Finoli v. Commissioner,86 T.C. 697, 721-722 (1986). Deductions are allowable under section 162 for expenses of carrying on an activity which constitutes the taxpayer's trade or business if those expenses are ordinary and necessary to the conduct of the trade or business. Section 212 allows the taxpayer to deduct ordinary and necessary expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. In order to deduct expenses of an activity, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner,85 T.C. 557, 569 (1985); Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In this context, "profit" means *660 economic profit, independent of tax savings. Landry v. Commissioner,86 T.C. 1284, 1303 (1986); Herrick v. Commissioner,85 T.C. 237, 255 (1985); Beck v. Commissioner,supra at 570; Estate of Baron v. Commissioner,83 T.C. 542, 557-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Surloff v. Commissioner,81 T.C. 210, 233 (1983). While the expectation of economic profit need not be reasonable, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued it, with the objective of making a profit. Beck v. Commissioner,supra;Fox v. Commissioner,80 T.C. 972, 1006 (1983); Dreicer v. Commissioner,supra.
In making this determination, all relevant facts and circumstances are to be taken into account.[35]Finoli v. Commissioner,86 T.C. 697, 722 (1986); Golanty v. Commissioner,supra;Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). Greater weight must be given to objective facts than to petitioners' mere statements of intent. Sec. *661 1.183-2(a), Income Tax Regs.; Beck v. Commissioner,supra;Flowers v. Commissioner,supra;Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). *662 The term "profit" encompasses appreciation in assets. Sec. 1.183-2(b)(4), Income Tax Regs.; Lemmen v. Commissioner,77 T.C. 1326 (1981). [36]
There is no doubt that this activity is not merely a hobby. It is one of the largest operations within the industry. It is run by people knowledgeable in this area. They keep extensive records. Petitioners are mere passive investors; they receive no personal enjoyment or recreation from this activity. At first glance it appears that this is a package of tax benefits. With a minimum investment, petitioners were able to claim large deductions from the activity. They did this by purportedly personally assuming partnership debt. Petitioners had no expertise in the area. The assets were very high priced. And, the promoter of the investments also prepared the investors' personal tax returns. After trial, petitioners conceded that the assumption of debt and loss allocations was impermissible. The *663 deductions petitioners are still claiming are limited to the extent of their investments. [37] We have found that it is possible for petitioners to build up equity in their cattle over time. There is no doubt that tax savings play an important role in these investments. Yet there are profits to be made independent of tax savings. There is a real chance that petitioners will profit from capital appreciation. For this reason we find that petitioners' objective was not merely to purchase tax benefits. A profit objective is there. Accordingly this is an activity engaged in for profit and the associated expenses are deductible, unless they fail to satisfy some other requirement of the law. The next issue we must decide is whether the partnerships incurred expenses and if they did, whether those expenses are deductible for Federal income tax purposes. We have previously held in this opinion that the partnerships were engaged in a business for profit. Accordingly, under section 162(a), all ordinary and necessary *664 business expenses are deductible. This includes all ordinary and necessary expenses incurred in carrying on the business of farming. Section 1.162-12, Income Tax Regs.
Clearly, in these cases the expenses incurred in maintaining and caring for the breeding cattle are deductible. The problem that arises is that the expenses were incurred by the Management Company, not the limited partnerships themselves. Accordingly these expenses are deductible by the management company. And, to the extent these expenses exceed revenues, they create losses. In order for these losses to pass through to the limited partnerships as partners of the Management Company, section 701, the limited partnerships must have adequate basis in the Management Company (outside basis) to absorb the losses. Section 704(c). [38] Accordingly the limited partnerships may claim their proportionate share of the losses incurred by the Management Company, to the extent of their respective basis in the Management Company.
*665 The next issue for decision is whether the debt itself is bona fide. The Ninth Circuit in Estate of Franklin set out the following test to determine if the debt is bona fide: To justify the [interest] deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him [the debtor] to make a capital investment in the amount of the unpaid purchase price. [Estate of Franklin v. Commissioner,544 F.2d 1045, 1049 (9th Cir. 1976).] In this case the partnerships, and therefore the partners, did have personal liability -- the indebtedness was recourse. Furthermore, the amount of the debt did not exceed the value of the cattle. Because this analysis is detailed supra, we will not repeat it here. Suffice it to say that the debt was bona fide. We must next decide whether interest expenses were incurred and, if incurred, whether there was a bona fide debtor-creditor relationship. We are convinced that the interest expenses claimed on the cattle purchase debt were in fact paid. Records *666 indicate that some of the contribution money was used to pay interest and that raised calves were also used to pay interest. Respondent offered no proof that the interest expenses were not paid. The next issue we must decide is whether the partnership may deduct an allowance for depreciation. Respondent disallowed the depreciation deductions claiming that petitioners failed to prove that there was a bona fide sale, and that they failed to prove a proper cost basis, a proper method of depreciation, or a proper useful life. Respondent further determined that petitioners were protected against any actual loss from depreciation on the cattle. We have previously held that there was a bona fide sale. Accordingly, the partnerships' bases are the costs of the cattle. [39] Sections 167(g), 1011, and 1012. The partnerships used the double declining balance and sum of the years digits methods of depreciation, both of which are proper methods of depreciation. Section 167(b). Respondent also claimed that the partnerships failed to use a proper useful life when computing depreciation. The partnerships used a seven-year class life which is the useful life prescribed in Rev. Proc. 77-10, 1977-1 C.B. 548, 552. *667 Given the fact that petitioners used a useful life prescribed by respondent, the disallowance of depreciation on that ground seems to be moot. Respondent's last determination as to depreciation is that the partnerships are protected against actual economic loss on the cattle. We have previously held that there is no evidence that petitioners were protected against loss. Accordingly we find for petitioners on this issue. The next issue we must decide is whether petitioners may deduct the loss attributed to the management fee paid by the partnerships to the Management Company. The fee was paid on a crop share [40] basis. The gain from disposing of the calves was offset by the management fee (a deductible expense). [41] In so far as respondent disallowed the management fee, he is not sustained because the fee is an ordinary and necessary business expense. However, the value of the calves should have been included in the income of the Management Company. *668 The next issue we must decide is whether the purchases of the breeding cattle are eligible for the investment tax credit. Cattle are section 38 property and are therefor eligible for the credit. Section 48(a)(6). The next issue we must decide is whether the disposition of the cattle qualifies for preferential capital gains treatment. Breeding cattle are section 1231 property after they have been held for 24 months. Section 1231(b)(3)(A). Accordingly, the disposition of breeding cattle, including culled cows (section 1.1231-2(b)(1), Income Tax Regs.), is taxed pursuant to section 1231(a) subject to the recapture provisions of section 1245. Calves which are used for payment of management fees or payment on the notes are not held for breeding purposes and are not accorded section 1231(a) treatment. Section 1.1231-2(b)(1), Income Tax Regs.
The next issue raised for our consideration is whether an increased rate of interest applies under section 6621. Section 6621(d), redesignated as 6621(c), provides for an increased rate of interest if the underpayment is attributable to one or more tax motivated transactions and the underpayment exceeds $1,000. Sec. 6621(c)(2). A tax *669 motivated transaction includes a valuation overstatement within the meaning of 6659(c). Sec. 6621(c)(3)(A)(i). A valuation overstatement occurs if the value of any property or the adjusted basis of property claimed on a return is 150 percent or more of the amount determined to be the correct value or adjusted basis. Sec. 6659(c). Respondent has the burden of proof as to this issue. Rule 142(a). We have previously held that the purchase price of the cattle was within a reasonable range of actual value. We did not determine a percentage or dollar value. Respondent has not persuaded us that the overstatement is 150 percent or more. Since respondent has not met his burden of proof, we find that section 6621(c) is not applicable. In summary, we have decided that the transaction in issue should be respected for Federal income tax purposes. The expenses incurred by the partnerships are allowed to the extent set forth herein. In addition, petitioners are permitted their allowable share of partnership items (as previously discussed). Any losses claimed by the petitioners from the partnerships are allowed to the extent of the partner's individual basis. To reflect the foregoing, *670 Decisions will be entered under Rule 155.
APPENDIX A
Docket No.
Petitioners
12479-82
Ralph W. Bales and
Ruth C. Bales
18832-82
Perry D. McBroom and
Jacie S. McBroom
4499-83
Donald M. Mundt
12274-83
Robert E. Roush and
Sharol D. Roush
13174-83
Chuck E. Carruth and
Diane Carruth
13800-83
Carol A. Callahan and
The Estate of Hon Callahan
14178-83
Robert J. Ricks
14956-83
Duane A. Berndt
16414-83
Donald G. Yount and
Neome Yount
18099-83
Carol S. Beatty
24307-83
Richard E. Turner and
Carolyn L. Turner
21409-84
Perry D. McBroom and
Jackie S. McBroom
28638-84
Charles Bradshaw and
Aloma G. bradshaw
28639-84
Gerald L. Curry
28657-84
Thelma Osborn
28681-84
John W. McDowell and
Martha H. McDowell
28787-84
Russell D. Buchmiller
28938-84
Eugene L. Albertson and
Beverly Albertson
29108-84
James L. Smith and
Edna E. Smith
29111-84
Kenneth L. Romig and
Colene L. Romig
29404-84
Rodney A. Moore and
Betty M. Moore
29464-84
John M. Newey
29594-84
Richard E. Turner and
Carolyn L. Turner
29681-84
James E. Pugh and
Donna M. Pugh
29701-84
John D. Gaskins, Jr. and
Kathren L. Gaskins
1970-85
Fred L. Payne and
Eleanor R. Payne
*671 Appendix B
Docket No.
Year Deficiency
Additions to tax
12479-82
1977
14,136.50
1978
20,475.00
Section 6651(a)(1)
18832-83
1978
4,403.00
263.00
4499-83
1977
3,335.00
1978
5,416.00
12274-83
1976
3,353.00
1977
4,352.00
1978
4,189.00
1979
9,352.00
13174-83
1976
1,256.00
1977
2,774.00
1978
4,165.00
1979
6,081.00
1980
5,377.00
13800-83
1976
3,300.00
1977
4,373.00
1978
5,271.00
1979
7,394.00
14178-83
1974
4,694.72
1975
3,135.58
1976
4,000.00
1977
10,203.20
1978
32,555.50
1979
7,490.00
14956-83
1976
3,886.00
1977
5,415.00
1978
7,949.00
1979
7,911.00
16414-83
1977
5,728.00
1978
5,716.00
1979
4,839.00
18099-83
1981
2,231.22
24307-83
1979
3,040.00
Section
Section
6651(a)
6653(a)
21409-84
1980
4,497.00
385.45
87.40 28638-84
1974
5,085.00
1975
5,681.00
1976
5,968.00
1977
5,741.00
1978
5,399.00
28639-84
1974
2,875.00
1975
3,255.00
1976
3,693.00
1977
3,611.00
1978
6,300.00
28657-84
1977
5,941.00
1978
7,112.00
1979
9,412.00
28681-84
1974
2,915.00
1975
3,753.00
1976
4,931.00
1977
4,672.00
1978
6,145.00
1979
6,206.00
28787-84
1974
6,291.00
1975
6,821.00
1976
6,884.00
1977
7,905.00
1978
8,675.00
1979
10,149.00
28938-84
1977
9,142.00
1978
10,597.00
29108-84
1974
3,090.00
1975
3,044.00
1976
5,001.00
1977
3,773.00
1978
3,774.00
1979
4,591.00
29111-84
1977
7,203.00
1978
7,844.00
1979
8.898.00
29404-84
1974
5,834.00
1975
7,856.00
1976
8,894.00
1977
11,581.00
1978
15,961.00
1979
16,755.00
29464-84
1974
3,536.00
1975
4,101.00
1976
4,869.00
1977
4,869.00
1978
7,836.00
1979
7,575.00
29594-84
1974
4,020.00
1975
4,223.00
1976
3,647.00
1977
3,367.00
1978
3,153.00
29681-84
1977
3,723.00
1978
3,424.00
1979
3,302.00
29701-84
1975
7,267.00
1976
7,881.00
1977
6,993.00
1978
11,873.00
1979
15,035.00
1970-85
1974
5,485.00
1975
5,845.00
1976
5,790.00
1977
9,745.00
1978
9,191.00
1979
11,268.00
*672 Footnotes
1. Appendix A sets forth petitioners in these consolidated cases by docket number and name.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Unexplained in this record is how ownership of the cattle passed from Walter J. Hoyt, Jr. to his children at his death and why Jay Hoyt did not own any of those cattle. We suspect he did not claim an ownership interest in the cattle sold to the partnerships to give credence to his claim that Hoyt & Sons sold the cattle to his partnerships at arm's length.↩
4. Some of these cases consolidated for trial involve the years 1974, 1975, and 1976. Those years pertain to investment tax carrybacks from the years 1977, 1978, and 1979. We will continue to refer to the years in issue as the years 1977, 1978, and 1979.↩
5. A catch calf is a calf which a breeder would sell off for a minimum price. The catch calf, in effect, is of minimum quality -- something like a performer on the "Gong Show" as compared to one at the Metropolitan Opera.↩
6. The interest rate varied somewhat on the notes depending on which year the note was made. The rates did not deviate materially from the 6 percent figure, however. ↩
7. In other words it takes 4-5 years before a young heifer calf becomes an income-producing breeding cow. The principal repayments are accordingly delayed until such time as there is income from the animal to pay off the purchase price.↩
8. The partnerships reported as section 1231 gains, the exchange of breeding cattle to Hoyt & Sons as payment on the notes. The partnership returns do not indicate whether these breeding cattle had been previously depreciated.↩
9. The payment schedules on a few of the notes were changed pursuant to extension agreements signed by the parties.↩
10. One of the expenses paid for by the management company was insurance on the cattle.↩
11. Each partnership entered into its own share crop operating agreement. However, it appears that all the agreements contain the same language.↩
12. The management company indicated on its capital account that it had made large payments of interest to Hoyt & Sons which we assume to be raised calves.↩
13. There is no indication whether these cattle had been depreciated. ↩
14. These calves may have been the calves received as crop shares.↩
15. Curiously, in 1979 Jay Hoyt allocated losses to himself from the management company in an amount which matched his guaranteed payments thereby making receipt of his guaranteed payments tax free. He did not allocate any losses to himself for taxable years 1977 and 1978 although he received guaranteed payments in those years as well.↩
16. A bull can sire 25-35 calves a season on average. This number can change depending on the age of the bull and on the harshness of the terrain.↩
17. A multi-sire group is a group of bulls that service the same cow herd. This is done in areas of arid terrain where the cows are very spread out. The multi-sire group is used because a single bull could not service all the cows himself because there would be too much ground to cover. The most preferred group in a multi-sire group is one in which all the bulls are full siblings. The next best group is if all the bulls are paternal half siblings.↩
18. The progression is as follows: Breed a full blood to a non-Shorthorn, get a 1/2 blood. Breed that 1/2 blood to a full blood, get a 3/4 blood. Breed the 3/4 blood to a full blood, get a 7/8 blood. Breed that 7/8 blood to a full blood get a 15/16th blood. That 15/16 blood can be registered as a pure blood Shorthorn. All the cattle prior to the 15/16 blood can be registered as appendix registry Shorthorns.↩
19. It appears that the Hoyts have not always kept birth weight records. However, they began recording birth weights at some point in their operation.↩
20. One expert testified that the Hoyt name was worth $1,300 per animal. Although this figure is more boasting than reality it is indicative of the fact that the Hoyt name adds value.↩
21. Respondent's counsel continually tried to point out that only his expert saw an actual random sample of the herd. No one did on July 14 because that plan was abandoned. Furthermore, respondent failed to prove what a random sample of the herd would have been. That fact was not stipulated to nor did respondent introduce any evidence on that point.↩
22. Dr. Allen attached to his expert report, as exhibit B, a list of average prices for Shorthorn cattle (females only) per year reported to the ASA. The average price for 1979 was $1061. The average price for 1984 was $1,189. This is an increase of 12 percent from 1979 to 1984.↩
23. Attorneys for petitioners had boxes filled with cattle records. An agent of the IRS came to the attorneys' office to pick up the boxes of records. The agent signed and initialled every page of an inventory list of the boxes he picked up. The boxes contained approximately 17,000 documents. Dr. Allen never saw these records. We assume respondent lost them somewhere along the way.↩
24. A "lot" consists of any of the following: (1) one bred female, (2) one cow and calf, (3) one cow and her transferred embryos, (4) one open female, (5) one bull, or (6) embryos out of one female.↩
25. This issue was not raised in docket no. 13800-83. ↩
26. The issues of whether a bona fide sale took place for depreciation purposes and whether petitioners were insured against any economic loss were only raised in the following cases: docket Nos. 28638-84, 28639-84, 28657-84, 28681-84, 28787-84, 28938-84, 29108-84, 29111-84, 29404-84, 2946-84, 29594-84, 29681-84, 29701-84, and 1970-85. ↩
27. The issue of the management fee was only raised in the following cases, docket Nos. 18832-82, 04499-83, 12274-83, 13174-83, 14178-83, 14956-83, 16414-83 and 24307-83.↩
28. This issue was separately stated in the following cases, docket Nos. 28638-84, 28639-84, 28681-84, 28787-84, 29108-84, 29404-84, 29464-84, 29594-84, 29701-84 and 1970-85.↩
29. This issue was not raised in docket No. 13800-83.↩
30. Transactions which are fictitious or a mere paper chase are also considered shams. Falsetti v. Commissioner,85 T.C. 332↩ (1985). However these cases do not deal with a phantom herd or other indices of fictitiousness.
31. We have shied away from placing too much emphasis on the values placed on the cattle by petitioners' experts for the simple reason that they are closely associated with the Hoyts. However, when it comes to determining changes in prices over time, petitioners' experts are more independent because their opinions do not concern the Hoyts in particular. Consequently, we think that the experts' testimony on this point is most persuasive.↩
32. This section has been adopted in all jurisdictions relevant to these cases. See Cal. Com. Code section 2401 (West 1964) (California); Nev. Rev. Stat. Ann. section 104.2401 (Miche 1986) (Nevada); Or. Rev. Stat. section 72.4010↩ (1987) (Oregon).
33. The California Food and Agricultural Code states as follows: Evidence of ownership of an animal or hide may include any of the following: (a) A recorded brand registered in the name of the person in possession of the animal or hide. (b) A brand inspection certificate. (c) A bill of sale from the owner of the brand on the animal or hide. (d) In the case of an unbranded animal or hide, a bill of sale which gives a description of the breed, sex, color, and natural markings, if any. (e) A dairy exemption number. [Cal. Food and Agric. Code section 16522↩ (West 1986).]
34. The management company paid for insurance on the cattle as part of its service. This is a service petitioners are paying for. This does not mean that the seller has insured the herd for the seller's benefit.↩
35. Sec. 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which should normally be considered in determining whether an activity is engaged in with the requisite profit objective. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling, but rather it is the totality of the facts and circumstances taken as a whole which is determinative. Sec. 1.183-2(b), Income Tax Regs.↩
36. In Metcalf v. Commissioner,T.C. Memo. 1963-277↩, we recognized that the development of a breeding herd constitutes a profit seeking activity even though profits may only be expected in the long run.
37. Because of petitioners' concession, petitioners' bases in their partnerships are limited to their cash investments; the parties have stipulated to those amounts.↩
38. In Allen v. Commissioner,T.C. Memo. 1988-166↩, we held that in order for a shareholder to deduct losses which passed through his S corporation from a partnership interest held by the S corporation, the S corporation must have adequate basis to absorb the losses from the partnership. That reasoning can be applied in this case because of the comparable tiered structure (especially considering that the entity creating the losses was a partnership in both cases.)
39. Cattle used for breeding purposes are property subject to depreciation. Section 1.167(a)-6(b), Income Tax Regs.↩
40. We attach no significance to the term "crop share" for Federal income tax purposes. These payments more closely resemble expenses paid "in kind." 4 N. Harl, Agricultural Law, sections 27.03[1] and [2] (1988). ↩
41. The amount realized from the disposition is equal to the management fee (the expenses). The basis is zero. Accordingly the gain realized equals the expenses.↩