**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GARY D. HANSEN; JOHNEAN F.
HANSEN,
    *Petitioners-Appellants,*

    v.

COMMISSIONER OF INTERNAL
REVENUE,
    *Respondent-Appellee.*

No. 05-70658

Tax Ct.
No. 25191-96

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
September 15, 2006—Seattle, Washington

Filed December 18, 2006

Before: Mary M. Schroeder, Chief Circuit Judge,
Richard C. Tallman and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

19489

**COUNSEL**

Terri A. Merriam, Pearson Merriam, P.C., Seattle, Washington, for the petitioner-appellants.

Eileen J. O'Connor, Assistant Attorney General, Richard Farber, Anthony T. Sheehan, Attorneys, Tax Division, U.S. Department of Justice, Washington D.C., for the respondent-appellee.

## OPINION

BEA, Circuit Judge:

Gary and Johnean Hansen ("Hansens") appeal the judgment of the Tax Court in *Hansen v. Commissioner*, T.C.M. (RIA) 2004-269 (2004), upholding the Commissioner of Internal Revenue's ("Commissioner") imposition of a negligence penalty pursuant to I.R.C. § 6662(a) for claiming losses in 1991 from a cattle partnership in which they had invested. The Hansens claim error, asserting that the Tax Court ignored relevant facts, applied an improper negligence standard, and inadequately considered the Hansens' own victimization as members of the partnership. We have jurisdiction pursuant to 26 U.S.C. § 7482(a)(1) and affirm the Tax Court's decision upholding the negligence penalty.

## I.

The Hansens were partners in a total of six cattle-breeding and tax-shelter partnerships promoted and run by Walter J. Hoyt, III ("Hoyt") from 1987 through 1996. In 1991, the Hansens claimed $32,306 in losses based on their participation in the Hoyt partnership Durham Shorthorn Breed Syndicate 1987-C ("DSBS87-C"). These losses, combined with losses from other Hoyt partnerships, reduced the Hansens' adjusted gross income ("AGI") in 1991 from $70,266 to $17,471, thereby lowering the Hansens' 1991 taxes from $11,852 to $799. In 1995, the Commissioner issued a Notice of Final Partnership Administrative Adjustment for the 1991 tax year of DSBS87-C and made computational adjustments on the

Hansens' 1991 tax return. These adjustments altered the Hansens' $32,306 loss in DSBS87-C to income of $8,586, thereby increasing the Hansens' 1991 tax liability from $799 to $8,523. Simultaneously, the Commissioner asserted an I.R.C. § 6662(a) negligence penalty against the Hansens for the DSBS87-C deductions that resulted in the $7,724 underpayment in 1991. Section 6662(a) allows for a negligence penalty of 20% of the underpayment, which resulted in a negligence penalty of $1,545.

## A. Hoyt Partnerships

DSBS87-C was one of over one hundred cattle- and sheep-breeding partnerships that Hoyt organized, promoted and operated from 1971 through 1998.[1] Hoyt enticed investors by marketing the partnerships not only as investment opportunities but also as tax shelters. Beyond marketing and running the partnerships, Hoyt acted as the tax matters partner ("TMP")[2] in each of the partnerships subject to the Tax Equity & Fiscal Responsibility Act of 1982, 26 U.S.C. § 6231(a)(7). Further, from approximately 1980 through 1997, Hoyt was a licensed enrolled agent qualified to represent taxpayers before the IRS. *See* 26 C.F.R. § 601.502(b)(3).

In Hoyt's capacities as TMP and as an enrolled agent, and through tax preparation companies that he owned and ran ("Tax Office of W.J. Hoyt Sons," "Agri-Tax," and "Laguna

---

[1]A detailed history of the Hoyt partnerships is available in numerous other cases involving the organization. *See, e.g.*, *River City Ranches #1 Ltd. v. Commissioner*, T.C. Memo. 2003-150, 85 T.C.M. (CCH) 1365, *aff'd in part, rev'd in part, vacated in part, & remanded*, 401 F.3d 1136 (9th Cir. 2005); *Adams v. Johnson*, 355 F.3d 1179, 1181-83 (9th Cir. 2004); *Bales v. Commissioner*, T.C. Memo. 1989-568, 58 T.C.M. (CCH) 431.

[2]A TMP is a general partner designated to act as the TMP, or, in the event the partnership fails to designate a TMP, a partner who has the largest profits interest at the end of the taxable year. I.R.C. § 6231(a)(7)(A)-(B).

Tax Service"), Hoyt directed the preparation of the tax returns of each partnership. He usually signed and filed the tax returns on behalf of the partners such as the Hansens. *Adams*, 355 F.3d at 1182.

In 1980, the IRS began auditing the Hoyt partnerships. This led to numerous Tax Court cases. One of the more prominent cases, and one that Hoyt utilized as support for the legitimacy of all his partnerships and their accompanying tax benefits, was *Bales v. Commissioner*, T.C. Memo. 1989-568, 58 T.C.M. (CCH) 431. The *Bales* decision ruled against the IRS. *Bales* found that pre-1980 Hoyt partnerships were not economic shams. Therefore, the deductions claimed through partnership expenses were legitimate. *Id.* at 447-51. *Bales* specifically found that during the years before 1980, Hoyt was operating a legitimate and, at times, thriving cattle business. *Id.* at 440-43.

Despite the setback of the *Bales* decision, the IRS continued its investigations into Hoyt partnerships, which led to the freezing of income tax refunds to Hoyt partners in February 1993. At this time, the IRS also disallowed individual Hoyt partners' claimed benefits and ceased issuing tax refunds stemming from the Hoyt partnerships. By 1997, the Hoyt partnerships entered bankruptcy, and, in 1998, the Bankruptcy Court consolidated all the assets and liabilities of the cattle and sheep partnerships and sold off the little remaining livestock.[3]

---

[3]By this time, Hoyt had been indicted on multiple counts of conspiracy and fraud in violation of multiple federal laws. In 2001, Hoyt was found guilty on each charge and was sentenced to almost 20 years in federal prison and ordered to pay over $100 million in restitution. *United States v. Hoyt*, No. 98cr529 (D. Or. 2001), *aff'd by unpublished opinion*, 47 Fed. Appx. 834 (9th Cir. 2002), *cert. denied*, 537 U.S. 1212 (2003). The district court judgment lists the Hansens as victims of Hoyt's fraud.

## B.   The Hansens' Investments

Petitioner Gary Hansen graduated from California Poly-technic State University with a degree in architecture and construction engineering. Petitioner Johnean Hansen works as a respiratory therapist. The Hansens have no formal business training or experience in farming, ranching, or investment partnerships. Their investment experience prior to their investments in Hoyt partnerships included purchasing a home, owning rental property, buying government bonds, opening bank accounts, holding term life insurance, selling Amway products, and participating in the retirement program sponsored by Mr. Hansen's employer.

The Hansens first learned of the Hoyt partnerships through a coworker and attended a Hoyt information presentation in Pasco, Washington in late fall 1986. The Hansens talked with other partners at this time and received informational materials. One of the materials the Hansens received, and subsequently relied upon in making their investment decision, was a document entitled "Hoyt and Sons: the 1,000 lb. Tax Shelter." This document explained how the Hoyt partnerships were designed to provide profits over time and emphasized that the primary return on investment is realized through tax savings.[4] Based on the information in this document, partners

---

[4]The tax savings were generated primarily through depreciation and interest expenses associated with the various cattle herds. However, the sheep- and cattle-breeding tax shelters were, in reality, largely economic shams. At the time of the Hansens' investment, for example, the IRS suspected that the partnerships' stated purchase price of the animals exceeded the animals' fair market value. Hoyt thus began depreciating the cattle at a much higher dollar amount than the actual cost, which led to greater depreciation deductions. Further, the IRS discovered that as early as 1980 Hoyt was selling and reporting cattle that did not, in fact, exist. Because investors did not have an interest in specific herds, cattle were indiscriminately shuffled between partnerships for tax purposes. Hoyt's practices combined to enable him to report grossly exaggerated depreciation expenses on the partners' tax returns and to "plug in" fake interest expenses, which expenses were conveniently sufficient to reduce to zero partners' tax liability.

were to profit from their investment in two ways: first, Hoyt would distribute partnership expenses among the partners, which the partners could use as a deduction to offset other sources of income; and second, the livestock would eventually be liquidated, which was expected to return a profit on the initial investment. *See Adams*, 355 F.3d at 1181-82.

The "1,000 lb. Tax Shelter" document contained a discussion of risks and statements regarding the legality of the tax savings. One such statement exclaimed: "If you're like most, your first impression of our program was, 'This deal looks too good to be true!' " One section of the document discussed the potential of IRS audits and stated that the IRS will brand the partnerships "an 'abuse' " and will subject the partnerships to "automatic" and "constant" audit.[5] Because of these "constant" audits, the document contained an explanation of why Hoyt's organization alone should be trusted to prepare tax returns for the partners:

> You will feel better when you see our name on your return, stating that all information is true. Then you have an affiliate of the Partnership preparing all personal and Partnership returns and controlling all audit activity with the Internal Revenue Service.

The document referred to this strategy as "circling the wagons" and depicted the IRS in an illustration as a Native American about to attack the "HS 'Circle of Wagons.' " This strategy allowed Hoyt to distribute partnership losses among the partners as needed to minimize partners' tax liability:

> If a Partner needs more or less Partnership loss any year, it is arranged quickly within the office, without

[5]Hoyt included this warning because, as explained *supra* in footnote 4, the IRS already had long suspected Hoyt's cattle- and sheep-breeding partnerships were economic shams and therefore abusive tax shelters. *See River City Ranches #1 Ltd.*, 85 T.C.M. at 1370-72.

the Partner having to pay a higher fee while an out-
side preparer spends more time to make the arrange-
ments.

Finally, in a section entitled "Tax Aspects," the document
warned investors as follows:

> Out here, tax accountants don't read brands, and our
> cowboys don't read tax law. If you don't have a tax
> man who knows you well enough to give you *spe-
> cific personal advice as to whether or not you belong
> in the cattle business*, *stay out*. The cattle business
> today cannot be separated from tax law any more
> than cattle can be separated from grass and water.
> Don't have anything to do with any aspect of the cat-
> tle business without thorough tax advice . . . .

After reviewing this and other Hoyt promotional materials
and talking with existing partners, but without any assistance
or advice from a "tax man" independent of Hoyt, the Hansens
invested in the Hoyt partnerships in late 1986. Upon joining
the Hoyt partnerships, the Hansens signed documents giving
Hoyt permission to incur debt for which they would be per-
sonally liable. Mrs. Hansen testified that at the time of their
investment, she and her husband believed it would provide
not only tax benefits but also a retirement income.

During the course of their investment, the Hansens partici-
pated in the partnerships. Beginning as early as 1989, the
Hansens attended monthly meetings of local Hoyt partners at
which guest speakers were sometimes present. Mrs. Hansen
consistently read the materials obtained from the Hoyt organi-
zation, which included independent materials that discussed
the aspects of the Hoyt business such as cattle figures. Mrs.
Hansen attended two ranch tours (in 1990 and 1993) at which
she, along with other Hoyt partners, visited Hoyt ranches and
saw cattle and equipment. Mrs. Hansen made frequent tele-

phone calls to the Hoyt organization when questions arose, particularly when questions arose involving tax matters.

The Hoyt organization prepared the Hansens' tax returns and refund claims from 1987 through 1991. In 1987, the Hansens reported on Schedule K-1[6] losses of $142,950. These losses eliminated the Hansens' 1987 tax liability, and they filed a Form 1045, Application for Tentative Refund, to carry back the excess loss in 1987 (the amount left over after reducing 1987 tax liability to zero) to 1984 and 1985. By so doing, the Hansens received refunds of all the income tax they had paid during these years. The Hansens continued to allow the Hoyt organization to fill out the tax returns and apportion partnership losses through 1991. The Hansens never sought verification of the information by a tax adviser or accountant, independent of Hoyt, on the Schedules K-1 or on their tax returns. The Hansens estimate that from 1987 through 1998, they sent the Hoyt organization over $100,000, which included payment on notes, partnership "assessments," contributions to Hoyt sponsored partnership retirement accounts, and 75% of the tax savings the Hoyt organization claimed to have generated.

## C.   IRS Involvement

In December 1988 the IRS sent a letter informing the Hansens their 1987 return had been selected for audit.[7] By letter dated April 25, 1989, the Hansens received further notice that the partnership DSBS87-C's 1988 tax year was under review. The letter stated in relevant part:

---

[6]A Schedule K-1 is used as part of the tax return to report the partner's share of income, credits, deductions and other items resulting from the partnership.

[7]The Hansens received this letter prior to receiving the 1987, 1984, and 1985 refunds. Mrs. Hansen testified that when she and her husband received these refunds without further correspondence from the IRS, they felt that everything was "okay" with the deductions.

> Based upon our review of the partnership's tax shel-
> ter activities, we have apprised the Tax Matters Part-
> ner that we believe the purported tax shelter
> deductions and/or credits are not allowable and, if
> claimed, we plan to examine the return and disallow
> the deductions and/or credits. The Internal Revenue
> Code provides, in appropriate cases, for the applica-
> tion of a negligence penalty under section 6653(a)
> . . . with respect to the partners.

By the time they filed their 1991 tax return, the Hansens had
received eight notices informing them the IRS was beginning
an examination of various Hoyt partnerships in which they
had been involved, including DSBS87-C.

Hoyt had warned the partners the IRS might undertake such
action. Regarding the IRS's April 25, 1989 letter, Hoyt sent
a letter to the partners informing them to not worry about the
IRS's threats of disallowance. On another occasion, Hoyt sent
a letter to partners expressly contradicting information the
IRS earlier had provided the partners regarding the time spent
by partners which they claimed as material participation in the
partnership.[8] The IRS responded to Hoyt's letter, pointed out
the problems in the letter, and urged partners to seek indepen-
dent advice if still confused.

Despite these warnings and letters and express urging to
seek advice independent of Hoyt, the Hansens continued to
claim the deductions on their tax returns. Mrs. Hansen testi-
fied that she often corresponded with the Hoyt organization
when questions arose and that she read all the materials the
Hoyt organization sent her. Mrs. Hansen further testified that
she relied on the assurances offered by Hoyt and others within
his organization, particularly when issues with the IRS arose.
Because Hoyt loudly proclaimed the reach and authority of

---

[8]Under I.R.C. § 469, such participation is necessary to claim deductions
for partnership losses.

the *Bales* decision as vindication of the partnerships' activities and tax claims, particularly whenever tax complications with the IRS arose, the *Bales* decision greatly influenced the Hansens' decision to maintain their investment. Mrs. Hansen testified she read the *Bales* decision many times and that in her mind, it legitimized the partnership activities.

## D.    Procedural History

In 1995 the Commissioner issued a Notice of Final Partnership Administrative Adjustment ("FPAA") for the 1991 tax year of the DSBS87-C partnership. Following Hoyt's failure timely to petition the Tax Court for a redetermination of the adjustments in the FPAA, the Commissioner adjusted the DSBS87-C partners' individual 1991 returns and applied a negligence penalty against the partners for claiming a deduction arising from DSBS87-C. Pursuant to this negligence penalty, the Hansens were charged a $1,545 penalty because of their understatement of $7,724 in their 1991 tax return.

The Hansens brought suit challenging the negligence penalty in the United States Tax Court. Special Trial Judge Goldberg held a trial at which Mrs. Hansen was the only witness to testify. Following the trial, the Tax Court issued an opinion upholding the negligence penalty. *Hansen v. Commissioner*, T.C.M. (RIA) 2004-269 (2004). The court specifically found that the Hansens were negligent in using their Hoyt partnership losses virtually to eliminate their 1984, 1985 and 1987 through 1991 income taxes because they had relied solely on the Hoyt organization (which stood to receive the bulk of the tax savings generated) and had failed independently to verify the returns, despite repeated IRS warnings. *Id.* at 25. Further, the court found the Hansens negligent in claiming losses on their 1991 return because they had relied on the Schedules K-1 issued by the Hoyt organization without knowledge of how the losses were generated and without seeking tax advice independent of Hoyt, despite repeated warnings to do so. *Id.* at 25-26.

The Tax Court also rejected the Hansens' contentions that they had acted with reasonable cause and in good faith. *Id.* at 26-37. The court found that any reliance on tax advice from the Hoyt organization alone or partners in the Hoyt organization was insufficient because of the blatant conflicts of interest inherent in such advice, *i.e.*, the Hoyt organization was promoting the scheme and receiving 75% of the tax benefit from the Hansens' investment.[9] *Id.* at 27-29, 32-34. The court also rejected the Hansens' contention that the *Bales* decision provided reasonable cause to claim the 1991 deduction because the *Bales* case involved different investors, partnerships, years, and issues. *Id.* at 34-36. Finally, the court ruled that although the Hansens were indeed victims of Hoyt's fraud, such victimization did not grant them license to act negligently in claiming such large tax deductions. *Id.* at 36-37.

Because the Hansens do not challenge the Commissioner's disallowance of the various deductions, the sole issue before us is whether the Tax Court correctly determined the Hansens are liable under I.R.C. § 6662(a) for negligently understating their tax liability on their 1991 return. We hold that the Tax Court did not clearly err in upholding the negligence penalty.

## II.

### A.

We review findings of negligence by the Tax Court under the "clear error" standard. *Zachary H. Sacks v. Commissioner*, 82 F.3d 918, 920 (9th Cir. 1996). Accordingly, regarding the Tax Court's weighing of the evidence, "[w]e must uphold the

---

[9]The court explained that reliance on professional advice must be "objectively reasonable": "To be objectively reasonable, the advice generally must be from competent and independent parties unburdened with an inherent conflict of interest, not from the promoters of the investment." *Id.* at 27 (citations omitted).

tax court's finding unless we are 'left with the definite and firm conviction that a mistake has been committed.' " *Wolf v. Commissioner*, 4 F.3d 709, 712 (9th Cir. 1993) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## B.

**[1]** The Internal Revenue Code ("Code") imposes an accuracy-related penalty on underpayments of tax arising from the taxpayer's negligence, which is equal to 20 percent of the amount of the underpayment caused by taxpayer negligence. I.R.C. § 6662(a), (b). The Code defines negligence as "any failure to make a reasonable attempt to comply with the provisions of [the Code]," *Id.* § 6662(c), and requires the taxpayer to prove he acted with due care.[10] *See Collins v. Commissioner*, 857 F.2d 1383, 1386 (9th Cir. 1988) (stating the "Commissioner's decision to impose negligence penalties is presumptively correct"). Due care is an objective standard by which the taxpayer must show that he acted as a reasonable and prudent person would act under similar circumstances. *See id.*; Treas. Reg. § 1.6662-3(b)(1). Negligence is "strongly indicated" when "[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.6662-3(b)(1), (b)(1)(ii). We look at

---

[10]Pursuant to amendments to the Code in 1998, *see* Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685, the burden of production of evidence of taxpayer negligence with respect of penalties is now on the Commissioner. *See* I.R.C. § 7491(c). However, since this case precedes the effective date of § 7491(c), the burden of production of evidence of lack of negligence remains with the taxpayer. *See* Act of July 22, 1998, Pub. L. No. 105-206, § 3001(a), 112 Stat. 726. The process prior to the amendments following imposition of the penalty consisted of the taxpayer contesting the penalty in Tax Court before paying the penalties; at Tax Court, the taxpayer carried the burden to demonstrate reasonable cause for the underpayment.

both the underlying investment and the taxpayer's position taken on the tax return in evaluating whether a taxpayer was negligent. *Z.H. Sacks*, 82 F.3d at 920.

**[2]** The Code provides an exception to the negligence penalty when a taxpayer can demonstrate both reasonable cause for the underpayment and good faith in acting pursuant to such cause. I.R.C. § 6664(c)(1); Treas. Reg. § 1.6664-4(a).[11] The regulations further provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances," thereby adding a subjective element in determining whether the exception applies. Treas. Reg. § 1.6664-4(b)(1). Most important in this determination "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *Id.*

**[3]** Before examining the facts of this case, we note here the determination by two of our sister circuits that the Tax Court correctly upheld the negligence penalty imposed by the IRS on other partner-investors in DSBS87-C for the tax year 1991. Both *Mortensen v. Commissioner*, 440 F.3d 375 (6th Cir. 2006) and *Van Scoten v. Commissioner*, 439 F.3d 1243 (10th Cir. 2006) considered many of the arguments before us in this appeal and concluded the partner-investors were negligent. Because the facts of this case are remarkably similar to the facts of both *Mortensen* and *Van Scoten*, we are guided in part by these holdings.

## C.

The Hansens put forth a variety of arguments as to why the Tax Court clearly erred and as to why they acted with reasonable cause and in good faith in their investments in the Hoyt partnerships and in their tax deductions. Many of these arguments are overlapping. As our analysis will show, none of the

---

[11]The Hansens' 1991 return is subject to Treas. Reg. § 1.6664-4 as it existed on April 1, 1995. *See* Treas. Reg. § 1.6664-1(b)(2)(i).

Hansens' arguments demonstrate the Tax Court clearly erred in upholding the negligence penalty. Because "negligence in the claiming of a deduction depends upon both the legitimacy of the underlying investment, and due care in the claiming of the deduction," we examine both the Hansens' initial investment and their actions throughout the course of the investment. *Z.H. Sacks*, 82 F.3d at 920.

**1.**

Regarding both the objective negligence standard in I.R.C. § 6662(a) and the more subjective reasonable cause and good faith exception in I.R.C. § 6664(c), the Hansens fail to demonstrate the Tax Court clearly erred in finding they failed to act as would a reasonable investor, or a reasonable unsophisticated investor, faced with similar circumstances when the Hansens invested in the Hoyt partnerships.

[4] First, although warned to consult a "tax man" independent of Hoyt *ab initio*, at no time before their investment did the Hansens seek to verify the legitimacy of the tax benefits of the investment from a source independent of Hoyt. From the beginning of the investment, the Hansens were on notice that the investment took an extremely aggressive tax posture that could lead to frequent IRS audits. The Hansens admittedly relied on the "1,000 lb. Tax Shelter" document, which contained warnings to seek their own tax advice and to "stay out" of the investment absent such advice. The document further warned that the IRS considered the partnerships abusive and would subject them to "constant" audit.

[5] Other facts dating to the time of the investment suggested the investment was highly suspicious. For example, the Hansens were informed that all their tax returns should be prepared by Hoyt to effectuate sound defenses against IRS attacks. The Hansens further learned that Hoyt promised to secure a refund of their prior three years of taxes based on their investment. Despite these warnings and suspicious facts,

the Hansens invested in the partnership without seeking veri-
fication of the partnerships and their accompanying tax strate-
gies from a source independent of Hoyt.

[6] We have consistently held that given similar warning
signals, investors must undertake adequate investigations at
the time of investment to avoid the negligence penalty. In a
similar action contesting negligence penalties based on busi-
ness deductions, we stated that "[t]he discussions in the pro-
spectuses of high write-offs and the risk of audits should have
alerted taxpayers that their deductions were questionable at
best. Despite these warning signals, taxpayers did not reason-
ably investigate the venture before investing." *Collins*, 857
F.2d at 1386. We came to the same conclusion in *Z.H. Sacks*,
where the prospectus warned of the risk of investment, yet the
investors failed to conduct an adequate investigation. 82 F.3d
at 920. Similarly, in *Allen v. Commissioner*, we held that a
"plethora of warning signals surrounding the transaction were
sufficient to force the [investors] reasonably to investigate the
contribution scheme before they went forward." 925 F.2d
348, 353 (9th Cir. 1991).

The Hansens argue the warning signals were insufficient to
put them on notice to conduct further investigation into the
scheme. They point to other information in the "1,000 lb. Tax
Shelter" discussing the legitimate nature of the business and
argue that announcing the risk of audit does not mandate a
negligence penalty. The Hansens further argue that the Tax
Court ignored evidence that they reviewed independent maga-
zines prior to investing.

[7] However, these arguments do not negate the fact that
clear warning signals were actually present at the time of
investment; therefore, nothing the Hansens put forth demon-
strates the Tax Court committed clear error in finding inade-
quate the Hansens' investigation *regarding the tax benefits*
prior to investing.[12] Each of the Tax Court's findings is sup-

---

[12]There is no evidence in the record to suggest that either the Hansens'
discussions with other partners or their reviews of independent magazines
prior to investing concerned tax advice.

ported in the record, and it makes no unwarranted inferences concerning the Hansens' knowledge or action at the time of investment. Considering both the Sixth Circuit in *Mortensen* and the Tenth Circuit in *Van Scoten* affirmed the Tax Court's determination, the Tax Court's findings here should likewise be upheld. *See Mortensen*, 440 F.3d at 380-81; *Van Scoten*, 439 F.3d at 1252-60.

**2.**

**[8]** Next, the Tax Court found the Hansens' actions during the course of investment insufficient to establish they acted with reasonable care. The record indicates that throughout their investment, the Hansens relied on the Hoyt organization to prepare their individual tax returns. The Hoyt organization also reported the Hansens' share of partnership losses on Schedule K-1, which the Hansens never verified by recourse to a source independent of Hoyt. Based on the tax returns prepared by the Hoyt organization and the refunds the Hansens received, during the years 1984 through 1991, the Hansens paid only $6,511 in taxes on $406,645 of non-Hoyt related income.

**[9]** Additionally, the IRS sent the Hansens numerous warnings regarding the propriety of the deductions based on the Hoyt partnerships. From June 1989 through February 1992, the Hansens received eight notices from the IRS informing them the IRS was beginning audits of partnerships such as DSBS87-C. Without any investigation or advice independent of Hoyt regarding these notices, other than to discuss the matters with members of the Hoyt organization, the Hansens claimed $59,476 in partnership losses in 1991, $32,306 attributable to DSBS87-C. According to the Tax Court, such action, in light of the numerous warnings from the IRS and the disproportionately large tax savings in relation to the investment, was enough to constitute negligence.

The Tax Court did not commit clear error in so holding. The Hansens put forth the following arguments as to why they

acted reasonably in claiming the 1991 deduction from DSBS87-C: (1) Hoyt was an enrolled agent; (2) the Hansens discussed the state of the partnership with other Hoyt partners; (3) the Hansens indirectly relied on professionals consulted by other partners and by the Hoyt organization; (4) the Hansens personally monitored the Hoyt business by reading information sent to them and participating in ranch tours; and (5) the Hansens received refunds after the IRS notified them it might audit their returns. However, each of these alleged defenses involves either pure reliance on the Hoyt organization or large assumptions regarding the state of the partnerships based both on information from the Hoyt organization (and in some instances independent articles) and on IRS inaction.

[10] As the Tax Court explained, the Hansens' "investigation into the partnership went no further than members of the Hoyt organization and other Hoyt partner-investors." *Hansen v. Commissioner*, T.C.M. (RIA) 2004-269, 33 (2004) We have previously held that a taxpayer cannot negate the negligence penalty through reliance on a transaction's promoters or on other advisors who have a conflict of interest. *See Neely v. United States*, 775 F.2d 1092, 1095 (9th Cir. 1985) ("Reasonable inquiry as to the legality of the tax plan is required, including the procurement of *independent legal advice* when it is common knowledge the plan is questionable." (emphasis added)); *accord Zmuda v. Commissioner*, 731 F.2d 1417, 1422 (9th Cir. 1984). Although the Hansens may have done some things to keep track of the Hoyt partnerships, it was not clear error for the Tax Court to conclude that even a taxpayer with similar characteristics as the Hansens in a similar situation would seek further advice based on the warning signs present throughout the investment. Given facts analogous to the present case, the Sixth Circuit in *Mortensen* concluded the investor's actions constituted little more than "hunker[ing] down." 440 F.3d at 389. The Tenth Circuit held the same. *Van Scoten*, 439 F.3d at 1256 (holding that "the Van Scotens[sic] investment monitoring efforts, which mostly

consisted of reviewing information provided by the Hoyt organization" did not cure the failure to seek independent tax advice regarding the validity of the cattle partnerships and the concomitant tax deductions). We agree and decline to find clear error in the Tax Court's holding.

**3.**

We address two final arguments: (1) whether the *Bales* decision justifies the Hansens' actions,[13] and (2) whether the Hansens' victimization precludes a finding of negligence.

**[11]** We agree with the Sixth Circuit's discussion of *Bales* in *Mortensen*. *See* 440 F.3d at 391-92.[14] *Mortensen* ruled that seeking professional advice, or reading a court opinion, may be a defense to a charge of negligence. 440 F.3d at 392. However, reliance on any type of professional advice must be reasonable given the circumstances of the taxpayer. Factors such as the differences between the *Bales* partnerships and those in which Mortensen had invested and the lack of any preclusive effect of *Bales* in prohibiting the Commissioner from challenging Hoyt partnership deductions persuaded the Sixth Circuit from finding clear error on the part of the Tax Court. *Id.*

**[12]** Although we recognize that "good faith reliance on professional advice is a defense" to the negligence penalty, like the Sixth Circuit we also examine the circumstances surrounding the advice to determine whether the taxpayer's actions were reasonable. *See Collins*, 857 F.2d at 1386. Any reliance on the *Bales* decision, therefore, must be viewed not

---

[13]The Hansens claim the Tax Court clearly erred in not finding *Bales* either controlling or evidence of reasonable cause by pointing to numerous similarities between the partnerships at issue in *Bales* and the partnerships of which they were members.

[14]The Tax Court's discussion of *Bales* in this case is identical to its discussion of *Bales* in *Mortensen*. *Compare Mortensen v. Commissioner*, 88 T.C.M. (CCH) 278, 252-53 (2004), *with Hansen v. Commissioner*, T.C.M. (RIA) 2004-269 (2004).

only in light of the numerous warning signs present throughout the investment, as discussed above, but also in recognition of the problems associated with such reliance as explained by the Sixth Circuit, *i.e.*, lack of preclusive effect of *Bales*, and the Commissioner's continuing challenges to partnership deductions, *etc.* In addition, a review of the record confirms the Tax Court's determination that although Mrs. Hansen read the *Bales* decision, no evidence proves she had any understanding or reliance on the decision independent of what Hoyt explained the decision to mean.[15] Thus, the Tax Court did not clearly err in holding *Bales* did not justify the Hansens' actions.

[13] Finally, the Hansens contend that Hoyt's massive deceptions made it impossible for them to uncover the true status of the partnerships. They argue that because it was extremely difficult for the IRS to uncover the full extent of Hoyt's fraud, the possibility of the Hansens uncovering the fraud, even with professional legal and tax advice, was nil. The Hansens weave the thread of victimization throughout their argument, claiming that the victims should not be further punished. In so doing, however, the Hansens misunderstand the nature of the negligence penalty. As the *Mortensen* court explained, "the issue is not whether a taxpayer is wholly successful in determining the tax legitimacy of a desired investment, but whether he is negligent for not reasonably investigating in the first place." 440 F.3d at 390. Our sole inquiry is whether the Tax Court clearly erred in its finding the Hansens failed to exercise the due care that is to be expected of a reasonable and prudent person under the circumstances in filing their tax return. *See Allen*, 925 F.2d at

---

[15]Furthermore, the record shows that the Hansens continued to receive notices from the IRS that they planned to audit the partnerships, even after the *Bales* decision. In fact, as noted above, prior to filing their 1991 tax return, the Hansens had received *eight notices* informing them the IRS was beginning an examination of various Hoyt partnerships in which they had been involved.

353. Had the Hansens sought verification of the legitimacy of their investment and the associated tax deductions from a source independent of Hoyt, their victimization arguments would be more persuasive, even if the independent advice had failed to uncover the full extent of Hoyt's scam. With the record before us, however, we conclude that while the Hansens put forth evidence of their good faith and victimization, they put forth nothing that proves the Tax Court's determination they were negligent was clearly erroneous.

## III.

In sum, we affirm the decision of the Tax Court upholding the negligence penalty imposed on the Hansens for their 1991 deductions stemming from their investment in the Hoyt partnership DSBS87-C. In light of the numerous warning signals brought home to the Hansens, the arguments concerning their diligence prior to investing and throughout the investment fail to demonstrate the Tax Court committed clear error. Further, the *Bales* decision and the fact of the Hansens' victimization, while unfortunate, do not constitute sufficient evidence to demonstrate the Tax Court's negligence finding constituted clear error.

**AFFIRMED.**