T.C. Memo. 2008-290

UNITED STATES TAX COURT

DAVID AND BEVERLY ALTMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16356-06.                    Filed December 22, 2008.

        R determined that Ps are liable for additions to
tax pursuant to secs. 6653(a)(1) and (2) and 6661(a),
I.R.C., for their 1982 tax year.

        <u>Held</u>:  Ps are liable for the additions to tax.

<u>John Gigounas</u>, for petitioners.

<u>David Rakonitz</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

        WHERRY, <u>Judge</u>:  This case is before the Court on a petition

for redetermination of an affected items notice of deficiency in

which respondent determined that petitioners are liable for the following additions to tax:[1]

| Year | Additions to Tax Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661(a) |
|------|------|------|------|
| 1982 | $315.50 | $32,280.26 | $1,577.50 |

Unless otherwise indicated, section references are to the Internal Revenue Code, as amended and in effect for the taxable year at issue. In their brief, petitioners concede that they are liable for the section 6661(a) addition to tax. The remaining issues for decision are whether petitioners are liable for the additions to tax under section 6653(a)(1) and (2).

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and the accompanying exhibits are hereby incorporated by reference into our findings. At the time they filed their petition, petitioners resided in California.

---

[1]The draftsmanship of the notice of deficiency leaves much to be desired. The first page of the notice of deficiency incorrectly reflects the combined amount of the additions to tax under sec. 6653(a)(1) and (2)--$32,595.76--as an addition to tax under sec. 6653(a)(1). The explanation attached to the notice of deficiency mistakenly refers to those additions to tax as having been determined under sec. 6653(a)(1)(A) and (B), which succeeded sec. 6653(a)(1) and (2). The first page of the notice of deficiency also erroneously references sec. 6662(d), which succeeded sec. 6661 and which applies to returns whose due date (determined without regard to extensions) is after Dec. 31, 1989. See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), (c)(2), (d), 103 Stat. 2395-2400. However, the explanation attached to the notice of deficiency correctly refers to sec. 6661.

Petitioner Dr. David Altman had a long and distinguished career. He received a Ph.D. in physical chemistry from the University of California at Berkeley in 1943, where Dr. J. Robert Oppenheimer was one of his thesis advisers.[2] Dr. Oppenheimer offered Dr. Altman a position as an associate chemist working for the Manhattan Project, which Dr. Altman accepted. Dr. Altman served in that position until the end of World War II. His work for the Manhattan project was interrupted by a 4-month leave of absence from late 1943 to early 1944 during which he worked on a special project for the U.S. Navy to determine whether the lubricant qualities of various detergents could act to calm waves and decrease the intensity of breakers during amphibious landings.

After World War II, Dr. Altman worked for 11 years for the Jet Propulsion Laboratory at the California Institute of Technology where he investigated a variety of chemicals, fuels, and oxidizers for use in rocket motors. Following a 3-year stint as head of the propulsion department at Aeronutronic Systems, Inc., a defense and aerospace subsidiary of the Ford Motor Co., he went to United Technologies Corp. There, he eventually became vice president of the Research and Engineering Departments at the Chemical Systems Division, before retiring in June 1981.

---

[2]Dr. Altman's thesis concerned surface tension and the detergent qualities of chemicals. He studied compounds such as oleic acid, palmitic acid, and sperm whale oil.

On December 29, 1982, petitioners invested in CAL-NEVA Partners (CAL-NEVA), a Nevada limited partnership involved in the growing of jojoba beans. In exchange for a 6.67-percent interest (5 units) in CAL-NEVA, they paid $5,000 in cash and signed a promissory note for $9,250.[3] Dr. Altman had invested in stocks and other partnerships before investing in CAL-NEVA, and he did not consider petitioners' investment in CAL-NEVA to be highly significant.

Sometime before petitioners invested in CAL-NEVA, Dr. Altman had received a promotional phone call from Yolanda J. Benham regarding an investment in CAL-NEVA. Ms. Benham was CAL-NEVA's general partner (and eventually its tax matters partner), and Dr. Altman had not had any dealings with Ms. Benham before that phone call. Before petitioners invested in CAL-NEVA Dr. Altman also spoke with Eugene Pace, "who was the president of what was to become the purported research and development contractor to * * * [CAL-NEVA], U.S. Agri Research & Development Corp." Bronson v. Commissioner, T.C. Memo. 2002-260.

In addition to Dr. Altman's conversations with Ms. Benham and Mr. Pace, petitioners were provided copies of a "Private

_____

[3]Although the note provided for a 16-year repayment term (6 years of semi-annual payments of interest only followed by 10 years of quarterly payments of principal and interest), petitioners only made payments on that note until 1988 or 1989.

Placement Memorandum"[4] before they invested in CAL-NEVA.[5]  The

private placement memorandum informed its readers that an

investment in CAL-NEVA was available only to investors who had,

among other things, "a minimum net worth (exclusive of homes,

furnishings, and automobiles) of at least $200,000, or, a net

worth of at least $100,000, and an annual income subject to

taxation at a marginal rate of not less than 50%".  In a section

entitled "RISK FACTORS", the private placement memorandum warned

of many risks and cautioned that "Investors must be prepared for

the possible loss of their entire investment."

A significant portion of the private placement memorandum

was dedicated to Federal tax issues.  In a section discussing

whether CAL-NEVA would be categorized as a partnership or a

corporation, the private placement memorandum cautioned that

"most of the tax shelter benefits would be lost to the Limited

Partners" in the event that CAL-NEVA was "treated for federal

income tax purposes as an association taxable as a corporation

rather than a partnership".  In a section discussing the

"Deductibility of Research or Experimental Expenditures", the

---

[4]Attached to that Private Placement Memorandum were a number
of exhibits, including a form of "Research and Development
Agreement" and a form of "License Agreement".

[5]That private placement memorandum was amended on Dec. 20,
1982.  The minimum capitalization requirement was "reduced to
$213,750 (75 units at $2,850 per unit) from $541,500 (190 units
at $2,850 per unit)."

private placement memorandum warned "that there is little published authority dealing with the specific types of expenditures which will qualify as research or experimental expenditures within the meaning of Section 174" and that "There are various theories under which such deductions might be disallowed or required to be deferred."  After addressing various theories on which the Internal Revenue Service might challenge deductions under section 174, the private placement memorandum stated that "No ruling by the Service has been or will be sought regarding deductibility of the proposed expenditures under Section 174 of the Code."[6]  At least three times in the private placement memorandum, prospective investors were told to consult their own tax advisers regarding the tax implications of an investment in CAL-NEVA.

Dr. Altman also did his own research into the jojoba plant; he understood jojoba oil to be a substitute for sperm whale oil.[7]

_____

[6]Immediately following that sentence is a citation to an "Opinion of Counsel to the General Partners".  That opinion, which was over 15 pages long, was signed by Barnet Resnick on behalf of the law firm of Caplan & Resnick.  According to Dr. Altman, the actual opinion was not provided to petitioners along with the memorandum.  However, the opinion was summarized under a heading of the memorandum entitled "TAX ASPECTS".

[7]"Jojoba oil is actually a liquid wax ester, unlike the triglyceride oils typically produced by plants, and is similar to sperm whale oil."  Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6.  A 1971 ban on the importation of sperm whale oil sparked an interest in domestic production of jojoba oil.  See id.

In addition, he did his own discounted cashflow analysis before petitioners invested in CAL-NEVA. His analysis was based on projected cashflows taken from the private placement memorandum. Those projected cashflows were preceded by a warning in all-caps font that they: (1) Had been prepared for the general partner and had not been audited; (2) were subject to a number of contingencies and assumptions which might or might not have occurred or been proven realistic; and (3) were not to be relied upon to indicate the actual results to be obtained.

In 1982 CAL-NEVA filed with the Internal Revenue Service and provided to petitioners a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., in which CAL-NEVA allocated to petitioners an ordinary loss of $12,932. In turn, petitioners on their 1982 joint Form 1040, U.S. Individual Income Tax Return, claimed an ordinary loss relating to their interest in CAL-NEVA of $12,932 as a deduction in computing their total income. Earl A. Mohler, a professional tax preparer, prepared that return.[8]

On February 11, 1987, respondent sent petitioners a notice of final partnership administrative adjustment (FPAA) issued to CAL-NEVA for its 1982 tax year. In the FPAA respondent disallowed research and development expenses of $193,150 and organizational costs of $42. See Bass v. Commissioner, T.C.

---

[8]On Apr. 15, 1986, petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, for their 1982 tax year. The amount of reported deductions remained unchanged.

Memo. 2007-361.  On March 16, 1987, a petition in the name of CAL-NEVA Partners, Yolanda J. Benham, Tax Matters Partner, was filed with the Court at docket No. 6594-87.  On October 18, 1993, the parties filed a stipulation to be bound by the result in Utah Jojoba I Research v. Commissioner (Utah Jojoba I), a case docketed at No. 7619-90.

The Court issued an opinion in Utah Jojoba I on January 5, 1998, in which it held that the partnership at issue in that case was not entitled to deduct its losses for research and development expenditures.  See Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6.  A decision in Utah Jojoba I was entered on January 8, 1998.  At that time, Ms. Benham could not be found.  Respondent eventually filed a motion for entry of decision and a motion to appoint a tax matters partner for CAL-NEVA.  On February 1, 2005, the Court ordered CAL-NEVA's partners to show cause why respondent's motion for entry of decision should not be granted.  No response to that order was received.  See Bass v. Commissioner, supra.  On April 11, 2005, the Court granted respondent's motion for entry of decision and entered a decision against CAL-NEVA upholding as correct the partnership item adjustments as determined and set forth in the FPAA for CAL-NEVA's 1982 tax year.  That decision was not appealed and became final on July 11, 2005.

On July 6, 2006, respondent issued petitioners a notice of deficiency for their 1982 tax year. Petitioners then filed a timely petition with this Court. A trial was held on March 19, 2008, in San Francisco, California.

OPINION

I. Burden of Production

Section 7491(c), which is applicable to court proceedings arising in connection with examinations commenced after July 22, 1998, shifts the burden of production to the Commissioner with respect to a taxpayer's liability for penalties and additions to tax. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727. The parties disagree as to whether section 7491(c) applies. Petitioners argue that "the negligence penalties were not partnership items but items to be determined at the partners' level" and that "The examination of the negligence penalties started when the July 6, 2006, Notice of Deficiency was sent to Petitioners asserting the negligence penalties for the first time." Respondent argues that the notice of deficiency "does not represent when respondent began his initial examination of the issue."

Although petitioners want us to decide this issue, because the outcome of this case is unaffected by the application (or lack thereof) of section 7491(c), we need not and do not decide

"whether the determination of additions to tax as affected items resulting from a partnership examination is a separate examination for purposes of the effective date of section 7491". Bass v. Commissioner, supra. As we will explain, even assuming that respondent has the burden of production, respondent has met that burden under the facts and circumstances of this case.

II. Additions to Tax Under Section 6653(a)(1) and (2)

Section 6653(a)(1) and (2) imposes additions to tax if any part of any underpayment of tax is due to negligence or disregard of rules and regulations.[9] For the purposes of this statute, negligence is defined as a "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299). "[T]he determination of negligence is highly factual." Bass v. Commissioner, supra.

The Court of Appeals for the Ninth Circuit, to which an appeal would ordinarily lie in this case, has held that a

---

[9]Those additions to tax are for: (1) An amount equal to 5 percent of the underpayment and (2) an amount equal to 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment which is attributable to negligence. Sec. 6653(a). That interest on which the penalty is computed is the interest for the period beginning on the last date prescribed by law for payment of the underpayment (without consideration of any extension) and ending on the date of the assessment of the tax. Id.

determination as to negligence for purposes of section 6653(a) in a case involving a deduction for loss that results from an investment "depends upon both the legitimacy of the underlying investment, and due care in the claiming of the deduction." Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217.

Petitioners contend that they were not negligent in investing in CAL-NEVA because Dr. Altman had discussions with Ms. Benham and Mr. Pace before petitioners made that investment. They also contend that Dr. Altman's research, investment analysis, and expertise in research and development (R&D) demonstrate their reasonableness in investing in CAL-NEVA. Regarding the reasonableness of their 1982 tax deduction relating to CAL-NEVA, they assert that they relied on Mr. Mohler. They rely heavily on Allison v. United States, 80 Fed. Cl. 568 (2008), in which the U.S. Court of Federal Claims held that the taxpayers in each of three cases had established reasonable reliance defenses and were entitled to refunds of additions to tax imposed on them under section 6653(a).

Respondent argues that petitioners were not reasonable in investing in CAL-NEVA or in claiming the deduction on their 1982 Federal income tax return for losses relating to that investment. Regarding petitioners' reasonableness in investing in CAL-NEVA, respondent points out that Dr. Altman's financial analysis was

based on projected cashflow projections in the private placement memorandum which the memorandum itself noted had not been audited and were based on assumptions that may or may not have been proven realistic. According to respondent, the drop in CAL-NEVA's minimum capitalization requirements on December 20, 1982, "should have heightened petitioners' concerns." Respondent asserts that reliance on Mr. Pace was not reasonable, as he had a financial interest in CAL-NEVA. As for petitioners' asserted reliance on Mr. Mohler, respondent argues that petitioners have not established that Mr. Mohler was provided with the private placement memorandum or that he conducted any research into the nature of that investment.

As explained below, although reasonableness--including reasonable reliance on professional advice--may serve as a defense to the additions to tax for negligence, see United States v. Boyle, 469 U.S. 241, 251 (1985), petitioners have not demonstrated that they acted with due care with respect to their investment in CAL-NEVA and subsequent deduction claimed in 1982 for a loss relating to that investment.

CAL-NEVA's underlying activity lacked legitimacy, as we held in Utah Jojoba I. See Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6 ("[W]e hold that Utah I was not actively involved in a trade or business and also lacked a realistic prospect of entering a trade or business."). Because CAL-NEVA

and the jojoba partnership at issue in Utah Jojoba I are
identical in all important respects, we need not rehash in detail
the license agreement and the R&D agreement entered into between
CAL-NEVA and U.S. Agri Research & Development Corp (the same
entity with which the partnership at issue in Utah Jojoba I
entered into a license agreement and an R&D agreement).  See <u>Bass
v. Commissioner</u>, T.C. Memo. 2007-361.  It is enough to note that
"the R & D agreement was designed and entered into solely to
provide a mechanism to disguise the capital contributions of the
limited partners as currently deductible expenditures and thus
reduce the cost of their participation in the farming venture."
<u>Utah Jojoba I Research v. Commissioner</u>, <u>supra</u>.

CAL-NEVA's true purpose was not well concealed.  As the
Court has observed in a number of other cases involving nearly
identical jojoba partnerships:

> First, the principal flaw in the structure of
> Blythe II was evident from the face of the very
> documents included in the offering. A reading of the
> R & D agreement and licensing agreement, both of which
> were included as part of the offering, plainly shows
> that the licensing agreement canceled or rendered
> ineffective the R & D agreement because of the
> concurrent execution of the two documents. Thus, the
> partnership was never engaged, either directly or
> indirectly, in the conduct of any research or
> experimentation. Rather, the partnership was merely a
> passive investor seeking royalty returns pursuant to
> the licensing agreement. Any experienced attorney
> capable of reading and understanding the subject
> documents should have understood the legal
> ramifications of the licensing agreement canceling out
> the R & D agreement. However, petitioners never
> consulted an attorney in connection with this

> investment, nor does it appear that they carefully
> scrutinized the offering themselves.

Christensen v. Commissioner, T.C. Memo. 2001-185; Serfustini v. Commissioner, T.C. Memo. 2001-183; Nilsen v. Commissioner, T.C. Memo. 2001-163; see also Bass v. Commissioner, supra; Kellen v. Commissioner, T.C. Memo. 2002-19.[10]

Dr. Altman is a very sophisticated individual, and we believe that he conducted his own research before petitioners invested in CAL-NEVA. In addition, petitioners have gone to great lengths to distinguish this case from the many other cases in which we have sustained negligence penalties stemming from investments in jojoba partnerships. While reasonableness inquiries are highly factual and every case must be decided on its particular merits, we have observed that "A guiding principle

---

[10]We note that this case is distinguishable from Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1990-380. In Kantor the Court of Appeals for the Ninth Circuit reversed this Court's affirmance of the imposition of a sec. 6653(a) addition to tax on the basis that the experience and involvement of the general partner and the lack of warning signs could reasonably have led investors to believe that they were entitled to deductions in light of the undeveloped state of the law regarding sec. 174. The Court of Appeals explained that the Supreme Court's decision in Snow v. Commissioner, 416 U.S. 500 (1974), left unclear the extent to which research must be "in connection with" a trade or business for purposes of qualifying for an immediate deduction under sec. 174. See, e.g., Nilsen v. Commissioner, T.C. Memo. 2001-163. Unlike the partnership in Kantor, CCJRP was neither engaged in a trade or business nor conducting research and development, either directly or indirectly. See Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6.

is that similarly situated taxpayers should be treated similarly." <u>Heller v. Commissioner</u>, T.C. Memo. 2008-232 n.4.  As we will explain below, petitioners' reasonable reliance defense does not differ materially from the reasonable reliance defenses found to be unavailing in those cases.  See, e.g., <u>Bass v. Commissioner</u>, <u>supra</u>; <u>Kellen v. Commissioner</u>, <u>supra</u>; <u>Christensen v. Commissioner</u>, <u>supra</u>; <u>Serfustini v. Commissioner</u>, <u>supra</u>; <u>Nilsen v. Commissioner</u>, <u>supra</u>.

Petitioners have not demonstrated that they sought any independent advice before they invested in CAL-NEVA, despite the abundance of warnings in the private placement memorandum.  In fact, Dr. Altman testified that he did not consult with anyone other than Ms. Benham and Mr. Pace before petitioners invested in CAL-NEVA.  Those individuals had obvious conflicts of interest and reliance on them was not reasonable.  See <u>Hansen v. Commissioner</u>, 471 F.3d 1021, 1031 (9th Cir. 2006) ("We have previously held that a taxpayer cannot negate the negligence penalty through reliance on a transaction's promoters or on other advisors who have a conflict of interest."), affg. T.C. Memo. 2004-269; <u>Masters v. Commissioner</u>, T.C. Memo. 1994-197 ("We cannot say that reliance on the advice of attorneys engaged by the promoter of the program amounts to reasonable and prudent conduct."), affd. without published opinion 70 F.3d 1262 (4th Cir. 1995).

Dr. Altman's own financial analysis does not support a reasonableness defense because it was based on projected cashflows taken from the private placement memorandum--projections which were preceded by a conspicuous warning that they were not to be relied upon.  This factual situation resembles the factual situation in Kellen v. Commissioner, supra, in which the taxpayer, a "well-educated and successful attorney and a sophisticated investor", prepared an analysis based on projections set forth in an offering memorandum that were coupled with a warning that they had been prepared for the general partner, were unaudited, and were not to be relied upon.  We held that "Any reliance on those projections was unreasonable."[11]  Id.  Moreover, Dr. Altman testified that he invested in CAL-NEVA knowing that the investment would provide a tax benefit--indeed, the anticipated tax benefit was part of his financial analysis.

The fact that Mr. Mohler prepared petitioners' 1982 joint Federal income tax return is insufficient to demonstrate that petitioners exercised due care in deducting losses relating to CAL-NEVA.  Although Dr. Altman testified that at some point he

---

[11]Dr. Altman testified that he attempted to verify the projected cashflows set forth in the private placement memorandum by doing "literature research" and by talking to Mr. Pace.  There is no documentary evidence as to the nature of his research, and his testimony is too vague to support a finding that his discounted cashflow analysis was reasonable.  Also, as we have noted, his reliance on Mr. Pace was unreasonable in light of Mr. Pace's obvious conflict of interest.

reviewed the tax consequences of his investment in CAL-NEVA with Mr. Mohler, he could not remember which documents he had shown Mr. Mohler, which is understandable given the more than 25 years that had passed since the events at issue had occurred. Moreover, according to Dr. Altman, Mr. Mohler "questioned the business of the profit motive" but Dr. Altman reassured him "that I had done the analysis of it and it looked like there would be a profit even under a very conservative set of circumstances." In any event, Mr. Mohler did not provide petitioners with a written opinion concerning their investment in CAL-NEVA and he did not testify at trial.[12] Because of this dearth of evidence, we are unable to conclude that Mr. Mohler did anything more than transfer the losses from the Schedule K-1 provided by CAL-NEVA onto petitioners' 1982 return. See Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989) ("Mr. Skeen also claims that he relied on advice given to him by co-workers whose experience he respected. However, no reliable evidence exists in the record suggesting the nature of the advice, if any, that he received from them."), affg. Patin v. Commissioner, 88 T.C. 1086 (1987).

In the end, petitioners have not demonstrated that a fully informed, competent tax professional advised them regarding the propriety of their claimed deduction in 1982 for a loss relating

---

[12]Petitioners did not attempt to call Mr. Mohler as a witness in this case, and there is no evidence suggesting that he was unavailable to testify.

to their investment in CAL-NEVA. That is particularly troublesome considering that they invested $5,000 in CAL-NEVA on December 29, 1982--2 days before the end of that year--and that same year claimed a $12,932 deduction for a loss relating to that investment.[13] Under the circumstances, petitioners acted with a lack of due care in claiming as a deduction on their 1982 joint Federal income tax return an ordinary loss of $12,932 relating to their interest in CAL-NEVA. Consequently, petitioners are liable for the section 6653(a)(1) and (2) additions to tax.[14]

The Court has considered all of petitioners' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

---

[13]Although petitioners also signed a promissory note for $9,250, it is questionable that they made even a single payment of $973 toward principal on that note. In any event, they did not pay the note in full. They stopped making payments on the note in 1988 or 1989--6 or 7 years after they signed the note-- even though the note was for a 16-year term.

[14]Because reasonableness inquiries are highly factual and because the facts underlying Allison v. United States, 80 Fed. Cl. 568 (2008), differ materially from the facts of petitioners' case, their reliance on that opinion does not aid them in establishing their reasonable reliance defense. For example, the reasonable reliance defenses in Allison were all supported by the testimony of witnesses (albeit who were associated with the investment) upon whom the taxpayers had relied. See id. at 577. No one other than Dr. Altman testified on petitioners' behalf in this case.

To reflect the foregoing,

Decision will be entered

for respondent.